UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

WINSTON MCLENNON, KARLICK PRICE, and
STEPHEN AUGUSTINE, individually and on
behalf of a class of all others similarly situated,

                       Plaintiffs,

          v.

THE CITY OF NEW YORK, NEW YORK CITY
POLICE COMMISSIONER WILLIAM J.
BRATTON, NEW YORK CITY POLICE
TRANSPORTATION BUREAU CHIEF THOMAS
CHAN, FORMER NEW YORK CITY POLICE
TRANSPORTATION BUREAU CHIEF JAMES
TULLER, NEW YORK CITY POLICE HIGHWAY
PATROL COMMANDER PAUL CIORRA,
HIGHWAY PATROL UNIT 3 OFFICER KEITH
PENNEY (Shield No. 16412), HIGHWAY
PATROL UNIT 3 OFFICER NICHOLAS
KONKOWSKI (Shield No. 6981), HIGHWAY
PATROL UNIT 3 OFFICER JOHN
LOUKOPOULOS (Shield No. 12569), HIGHWAY
PATROL UNIT #3 OFFICER JORDAN BISTANY
(Shield No. 22702), HIGHWAY PATROL UNIT #3
OFFICER GEORGE LUTI (Shield No. 26504),
NEW YORK CITY POLICE OFFICIALS JANE
and JOHN DOES 1–20 and HIGHWAY PATROL
OFFICERS JANE and JOHN DOES 1–20,

                       Defendants.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CV-6320 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Winston McLennon, Karlick Price and Stephen Augustine bring this action, on

behalf of themselves and a putative class, against the City of New York, New York City Police

Department ("NYPD") Commissioner William J. Bratton ("Commissioner Bratton"), New York

City Police Transportation Bureau ("NYCTB") Chief Thomas Chan ("Chief Chan"), Former

NYCTB Chief James Tuller, New York City Police Highway Patrol Commander Paul Ciorra ("Commander Ciorra"), Highway Patrol Unit 3 Officers Keith Penney, Jordan Bistany, George Luti, Nicholas Konkowski and John Loukopoulos, and other unnamed NYPD and Highway Patrol officials and officers, alleging that Defendants sanctioned, implemented and executed suspicionless searches and seizures at *de facto* vehicle checkpoints on New York City roadways, in violation of 42 U.S.C. § 1983.[1]  (Am. Compl. ¶¶ 1–2, Docket Entry No. 34.)  Plaintiffs purport to represent a class seeking (1) compensatory and punitive damages and (2) equitable relief.  (*Id.* ¶ 13.)  Plaintiffs seek compensatory and punitive damages for their unlawful seizures, false arrests and malicious prosecutions arising from the suspicionless vehicle checkpoints.  (*Id.* ¶ 15.) Plaintiffs also seek a declaration that the suspicionless vehicle checkpoints violate the Fourth and Fourteenth Amendments and a class-wide injunction enjoining Defendants from continuing such "policies, practices, and/or customs."  (*Id.* ¶ 14.)  Defendants move to dismiss all of Plaintiffs' claims, except for Price's false arrest claim.  (Defs. Mot. to Dismiss, Docket Entry No. 50; Defs. Mem. in Support of Defs. Mot. ("Defs. Mem."), Docket Entry No. 52.)  For the reasons set forth below, the Court grants in part and denies in part Defendants' motion to dismiss.

## I.  Background

The allegations in the Amended Complaint are assumed to be true for the purposes of this motion.  Plaintiffs allege that, while travelling on New York City highways, NYPD officers stopped Plaintiffs without any individualized suspicion of wrongdoing at *de facto* vehicle checkpoints "through the use of 'stand out' or 'step out' enforcement methods" ("Step-Out

---

[1]  McLennon was initially the only named Plaintiff and brought claims under federal and New York State law.  (Compl., Docket Entry No. 1.)  On April 24, 2015, the Court dismissed McLennon's false arrest and state law claims, but granted him leave to amend.  (April 24, 2015 Min. Entry.)  On May 8, 2015, Plaintiffs filed an Amended Complaint adding Price and Augustine as Plaintiffs and Bistany and Luti as Defendants.

Enforcement Checkpoints"). (Am. Compl. ¶¶ 12, 61–63.) Plaintiffs and a subclass of the putative class members allege that, after being stopped, they were seized, detained and maliciously prosecuted.[2] (*Id.* ¶ 24.) Plaintiffs allege that Defendants Penney, Bistany, Luti, Konkowski and Loukopoulos, along with John and Jane Doe NYPD and Highway Patrol officials and officers (collectively the "Individual Defendants"), carried out the suspicionless checkpoints and were inadequately trained, disciplined or supervised by Chief Chan, Tuller and Commander Ciorra (the "Supervisory Defendants"). (*Id.* ¶¶ 149–155.) Additionally, Plaintiffs contend that these constitutional violations were directly and proximately caused by the policies, practices "and/or" customs, devised, implemented and enforced by the City of New York, Commissioner Bratton, Chief Chan and Commander Ciorra (collectively the "Municipal Defendants").[3] (*Id.* ¶¶ 14, 149, 157.)

a.   **The October 28, 2011 incident involving McLennon**

On October 28, 2011, at approximately 2:55 AM, McLennon was driving on the Grand Central Parkway towards a service ramp connecting to the Long Island Expressway. (*Id.* ¶¶ 70–71.) The service ramp was a sharply curved, single-lane road with minimal lighting, thus limiting the ability of McLennon and other drivers to see what may be occurring ahead. (*Id.* ¶ 73.) As he rounded the curve, McLennon was forced to rapidly decelerate upon seeing Defendant Penney and a yellow taxi cab obstructing the road. (*Id.* ¶¶ 74, 77.) According to Plaintiff, Defendant Konkowski was sitting in the yellow taxi cab. (*Id.* ¶ 74.) No cones, caution

---

[2]   The Amended Complaint distinguishes between an "Injunction Class," consisting of persons unlawfully stopped at a Step-Out Enforcement Checkpoint, and a "Damages Class," consisting of a smaller subset of individuals who, in addition to being unlawfully stopped, were arrested or prosecuted based on the unlawful stop. (Am. Compl. ¶¶ 21–24.)

[3]   Chief Chan and Commander Ciorra are sued in both their individual and official capacities.

tape, rope, signs or flares had been set up to alert motorists to the obstruction. (*Id.* ¶ 75.) Because of the obstruction, McLennon was forced to stop his vehicle. (*Id.* ¶ 77.)

At that time, Penney approached the vehicle and asked McLennon "a series of targeted questions," including whether he had been drinking. (*Id.* ¶¶ 76, 78.) While he questioned McLennon, Penney shined his flashlight through the vehicle's windows in an attempt to see what was inside. (*Id.* ¶ 76.) Thereafter, Penney ordered McLennon to exit the vehicle and subjected him to a search and a portable Breathalyzer test. (*Id.* ¶ 80.) At some point, McLennon was arrested, and he was later arraigned for violations of the New York Vehicle and Traffic Law. (*Id.* ¶ 83.) The criminal complaint against McLennon was signed by Penney and indicated that McLennon had been stopped because he was driving with air fresheners hanging from his rear view mirror in violation of the Vehicle and Traffic Law. (*Id.* ¶ 84.) McLennon was released on his own recognizance. (*Id.* ¶ 85.) Following his arrest, he appeared in court multiple times. (*Id.*)

On July 21, 2012, after a suppression hearing in McLennon's criminal case, the Honorable Stephanie Zaro of the New York City Criminal Court, Queens County, issued a decision suppressing all evidence against McLennon. (*Id.* ¶¶ 86, 88.) Judge Zaro held that Penney and Konkowski's operation on the service ramp constituted a checkpoint subject to particularized procedures that the officers did not follow. (*Id.* ¶ 88.) Judge Zaro also found Penny's testimony that he was able to see six air fresheners hanging from McLennon's rear view mirror from fifty feet away to be incredible, and that the officers lacked a legal basis to stop and arrest McLennon. (*Id.* ¶ 87.) Thereafter, on November 21, 2012, the case against McLennon was dismissed and sealed. (*Id.* ¶ 89.)

### b. The NYPD and Highway Patrol Unit 3 receive notice of multiple unlawful checkpoints

A month prior to Judge Zaro's decision suppressing evidence in McLennon's case,

another judge on the New York City Criminal Court, Queens County, also found, like Judge Zaro, that NYPD officers deployed unlawful vehicle checkpoints in two criminal cases involving vehicle stops at the same service ramp used by McLennon. (*Id.* ¶ 91.) In June of 2012, Judge Michael Yavinsky suppressed evidence in *People v. Nandlall*, Docket No. 2011QN029355 (June 14, 2012) and *People v. Rakitzis*, Docket No. 2012QN000287 (June 27, 2012), finding that NYPD officers had used an unlawful vehicle checkpoint to stop the drivers on the service ramp in violation of the Fourth Amendment.[4] (Am. Compl. ¶ 91.) On August 16, 2012, employees of the New York Legal Aid Society served the decisions in *McLennon* and *Rakitzis* on the NYPD and on Highway Patrol Unit 3. (*Id.* ¶ 93.)

Thereafter, two more judges on the New York City Criminal Court, Queens County, issued decisions suppressing evidence obtained from unlawful checkpoints on the service ramp. (*Id.* ¶¶ 91–92.) First, on February 13, 2013, Judge Mary O'Donoghue suppressed evidence in *People v. Perez*, Docket No. 2011QN056990 (Feb. 13, 2013). (Am. Compl. ¶ 91.) A year later, on March 12, 2014, Judge David M. Hawkins suppressed evidence in *People v. Garcia*, Docket No. 2011WN043391 (Mar. 12, 2014). (Am. Compl. ¶ 91.)

### c. June 13, 2014 incident involving Price

In the early morning hours of June 13, 2014, Plaintiff Price was driving on the Grand Central Parkway as he approached the service ramp to the Long Island Expressway. (*Id.* ¶¶ 96–97.) Given the curvature of the road, trees and limited lighting, Price, like McLennon, was unable to see ahead on the service ramp. (*Id.* ¶ 99.) As he rounded the curve, Price sharply decelerated when he saw three vehicles stopped ahead of him on the service ramp. (*Id.* ¶ 100.)

---

[4] Plaintiffs do not attach copies of these decisions to the Amended Complaint but allege that Defendants conducted the Step-Out Enforcement Checkpoints in *Nandlall* and *Rakitizis*. (Am. Compl. ¶ 91.)

One of those vehicles was an unmarked burgundy-colored vehicle that was protruding into the roadway. (*Id.*) Plaintiffs allege that Defendant John Doe Officer #1 was sitting inside the unmarked vehicle. (*Id.*) There were no cones, caution tapes, ropes, signs or flares alerting traffic to the burgundy colored vehicle. (*Id.* ¶ 101.)

After Price slowed down, Defendant Bistany, who was also present at the scene, approached the vehicle with his flashlight and asked for Price's driver's license. (*Id.* ¶¶ 102–105.) Thereafter, Bistany asked Price to pull over and began questioning him about whether he had been drinking. (*Id.* ¶¶ 106–107.) At that time, Bistany looked through Price's windows with his flashlight, attempting to see the contents of the vehicle. (*Id.* ¶¶ 107–108.) After ordering Price to exit the vehicle, Bistany performed a Breathalyzer test on Price, which returned a result of .000%. (*Id.* ¶ 109.) Price was then taken to the 112th Precinct for a "chemical test." (*Id.* ¶ 112.) After Price refused the chemical test, he was arrested and subsequently arraigned for violations of the Vehicle and Traffic Law. (*Id.* ¶¶ 112–14.)

The criminal complaint filed against Price was signed by Bistany and stated that Price's vehicle was stopped because of it had air fresheners hanging from the rearview mirror and had tinted windows. (*Id.* ¶ 115.) Price disputes both of these allegations. (*Id.* ¶ 116.) Price was released on his own recognizance, but he was required to appear in court multiple times. (*Id.* ¶ 117.) After Bistany failed to appear at a hearing concerning Price's refusal to take a chemical test, Price's license was reinstated and, on February 2, 2015, Price accepted an adjournment in contemplation of dismissal and a one month sealing. (*Id.* ¶¶ 118–19.) On March 2, 2015, his case was dismissed. (*Id.* ¶ 120.)

### d. November 28, 2014 incident involving Augustine

On the night of November 28, 2014, Plaintiff Augustine was driving on the Grand

Central Parkway with two passengers, and was approaching the service ramp to the Long Island Expressway. (*Id.* ¶¶ 123–24.) Augustine did not see any signs indicating that a traffic checkpoint was ahead. (*Id.* ¶ 126.) However, he was forced to stop because Highway Patrol Unit 3 officers had stopped ten to fifteen vehicles ahead of Augustine on the ramp. (*Id.* ¶ 129.) According to Augustine, the officers were stopping vehicles in an arbitrary manner. (*Id.* ¶¶ 128–29.) Augustine saw John Doe Officer #2 sitting in a marked NYPD vehicle that was protruding into the roadway. (*Id.* ¶ 132.) There were no cones, caution tapes, ropes, signs or flares set up to alert traffic to the vehicle's presence. (*Id.* ¶ 133.)

Vehicles could proceed on the service ramp only after Defendant Luti shined a flashlight into the vehicle and signaled that they could proceed. (*Id.* ¶ 131.) As Augustine continued on the service ramp, he was forced to stop again as Luti approached, shining his flashlight into the windows of Augustine's vehicle. (*Id.* ¶¶ 134–35.) Luti asked for Augustine's driver's license and told him to pull over and exit the vehicle. (*Id.* ¶¶ 136–37.) Luti asked Augustine a series of questions, including whether he had been drinking. (*Id.* ¶¶ 138–39.) Luti searched Augustine and subjected him to a Breathalyzer test, which returned a .000% result. (*Id.* ¶ 140.)

Augustine was taken to the 112th Precinct and asked to submit to a chemical test. (*Id.* ¶ 143.) At some point, Augustine again took a Breathalyzer test that returned a .000% result. (*Id.*) Augustine was arrested and was subsequently arraigned on violations of the New York Vehicle and Traffic Law. (*Id.* ¶ 144.) The criminal complaint filed against Augustine was signed by Luti and stated that Augustine's vehicle was stopped during Luti's "safety checkpoint." (*Id.* ¶ 145.) Augustine pled guilty to disorderly conduct "to resolve the Vehicle and Traffic Law infractions charged against him without the need to make repeated court appearances." (*Id.* ¶ 146.)

## II. Discussion

### a. Standards of review

#### i. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

#### ii. Documents to be considered

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Wilson v. Kellogg Co.*, --- F. App'x ---, ---, 2016 WL 143454, at *1 (2d Cir. Jan. 13, 2016) (quoting *Allen*

*v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  In addition, courts may consider "documents that, although not incorporated by reference, are integral to the complaint."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).  A court need not consider other information outside the pleadings, but where a court does not exclude extraneous information, it must give notice to the parties and convert the motion to one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d); *see also Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (Before converting a motion to dismiss into a motion for summary judgment, "the court give sufficient notice to an opposing party and an opportunity for that party to respond."); *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202–03 (2d Cir. 2013) ("[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is strictly enforce[d] and mandatory.").

### b. Claims against Defendant Loukopoulos

Defendants move to dismiss all claims against Defendant Loukopoulos, arguing that the Amended Complaint contains no allegations specific to him.  (Defs. Mem. 20.)  Plaintiffs do not respond to the motion as to Loukopoulos.  The Amended Complaint does not allege that Loukopoulos was involved in the stop or arrest of McLennon, Augustine or Price.  Instead, the Amended Complaint states that Loukopoulos was involved in unconstitutional stops as a general matter.  (Am. Compl. ¶ 42.)  This single allegation is insufficient to plausibly allege that Loukopoulos is liable for the claims asserted in the Amended Complaint.  *See Victory v. Pataki*, --- F.3d. ---, ---, 2016 WL 373869, at *13 (2d Cir. Feb. 1, 2016) (The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983.").  Accordingly, the Court dismisses all claims against Loukopoulos
without prejudice.

### c.    Unlawful search and seizure claims

Although Defendants do not move to dismiss Plaintiffs' claims for unlawful search and
seizure for failure to state a claim, Defendants assert that the Individual Defendants are entitled
to qualified immunity from those claims.  (Defs. Mem. 20–21.)  According to Defendants, the
unconstitutionality of the officers' conduct was not "clearly established," and the officers were
"reasonable, even if mistaken, in assuming that th[e] procedure [utilized] did not constitute a
traffic checkpoint."  (*Id.* at 21.)  Defendants further assert that because the Queens County
District Attorney's office argued that the stops of Plaintiffs were constitutional, "it was at least
objectively reasonable" to stop McLennon, Price and Augustine.  (*Id.* at 21–22.)

"Qualified immunity protects public officials from liability for civil damages when one of
two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or
(b) it was objectively reasonable for the defendant to believe that his action did not violate such
law."  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479
F.3d 196, 211 (2d Cir. 2007)).  As to whether the right is clearly established, the "dispositive
inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in
the situation he confronted."  *Id.* at 92 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).
"Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation
is relevant in deciding whether a right is clearly established."  *Moore v. Vega*, 371 F.3d 110, 114
(2d Cir. 2004).  Overall, "the relevant question is whether a reasonable officer could have
believed the search [or seizure] to be lawful, in light of clearly established law and the
information the . . . officers possessed."  *Id.* at 115 (original brackets and ellipses omitted)

(quoting *Anderson*, 483 U.S. at 641).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . . 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion" to dismiss, but "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if 'the facts supporting the defense appear on the face of the complaint.'" *Hyman v. Abrams*, --- F. App'x ---, ---, 2015 WL 7147455, at *1 (2d Cir. Nov. 16, 2015) (quoting *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)). As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* (quoting *McKenna*, 386 F.3d at 436).

Accordingly, the Court assesses whether, on the face of the Amended Complaint, the Individual Defendants are entitled to qualified immunity from Plaintiffs' unlawful seizure claims.

### i. Plaintiffs' Fourth Amendment rights were clearly established

The Fourth Amendment to the Constitution requires that searches or seizures be reasonable, U.S. Const. amend. IV, and "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," *Dickerson v. Napolitano*, 604 F.3d 732, 750 (2d Cir. 2010) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). Despite that requirement, "neither a warrant nor probable cause, nor, indeed, any measure of individualized

11

suspicion, is an indispensable component of reasonableness in every circumstance." *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006) (quoting *Nat'l Treasury Emp. Union v. Von Raab*, 489 U.S. 656, 665 (1989)). The Supreme Court has recognized certain "limited circumstances in which th[e] usual rule does not apply," *Dickerson*, 604 F.3d at 750 (quoting *Edmond*, 531 U.S. at 37), and "a warrantless, suspicionless search [or seizure] may be justified 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable,'" *United States v. Amerson*, 483 F.3d 73, 80 (2d Cir. 2007) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).

This so-called "special needs" doctrine has been applied to permit suspicionless searches and seizures in a variety of contexts. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990) (highway sobriety checkpoints); *Lynch v. City of New York*, 589 F.3d 94, 104 (2d Cir. 2009) (mandatory Breathalyzer tests of certain police officers); *MacWade*, 460 F.3d at 268 (random container searches in the subway system). However, the doctrine is necessarily circumscribed, and "[a] 'program' or 'general scheme' of searches [or seizures] qualifies for treatment under the special needs doctrine only if the program's 'primary purpose' is *not* a 'general interest in crime control.'" *Lynch*, 589 F.3d at 100 (quoting *Edmond*, 531 U.S. at 38). Accordingly, as a threshold inquiry, "a court must conduct 'an inquiry into purpose at the programmatic level[,] . . . applying the special needs doctrine only if the primary programmatic purpose of the searches is unrelated to the government's general interest in crime control." *Id.* (internal quotation marks omitted) (quoting *Edmond*, 531 U.S. at 46). It is the program's "immediate objective" that is relevant; not its "ultimate goal." *Ferguson v. City of Charleston*, 532 U.S. 67, 68 (2001)); *see also Wagner v. Sprague*, 489 F. App'x 500, 501 (2d Cir. 2012) ("[T]he mere fact that crime control is *one* purpose — but not the *primary* purpose — of a

program of searches does not bar the application of the special needs doctrine." (citations omitted)).

Vehicle checkpoints have been upheld pursuant to the special needs doctrine. *See Lidster*, 540 U.S. at 427–28 (information-seeking vehicle checkpoints for purpose of locating witnesses to hit and run); *Sitz*, 496 U.S. at 455 (highway sobriety checkpoints); *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976) (vehicle checkpoints near U.S. border warranted based on difficulty of effectively containing illegal immigration at the border). However, a vehicle checkpoint whose primary purpose is crime control will not withstand scrutiny. *See Edmond*, 531 U.S. at 44 (striking down a drug interdiction vehicle checkpoint and noting that the Supreme Court "cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime").

"[T]he Supreme Court and th[e] [Second] Circuit have recognized, with reasonable specificity, the right of a motorist to be free from being stopped by the operation of an unreasonable checkpoint." *Mollica v. Volker*, 229 F.3d 366, 371 (2d Cir. 2000) (citations and internal quotation marks omitted). Where a program has a primary purpose other than a general interest in crime control, courts must assess the program's reasonableness by applying a balancing test. *See Dickerson*, 604 F.3d at 750; *see also Lynch*, 737 F.3d at 158 (To pass constitutional muster there must be a "further finding that the interests served by the special needs outweigh the privacy interests at stake."). In making that assessment, courts consider "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest that is compromised by the search, (3) the character of the intrusion imposed by the search, and (4) the efficacy of the search in advancing the government interest." *Dickerson*, 604 F.3d at 750–51.

Here, when Plaintiffs were stopped and seized at the Step-Out Enforcement Checkpoints, the right to be free from suspicionless searches and seizures except in certain "closely guarded" circumstances was clearly established. *See Cassidy v. Chertoff*, 471 F.3d 67, 75 (2d Cir. 2006) (discussing "the rubric courts must use to determine whether a particular governmental search falls within the 'closely guarded category of constitutionally permissible suspicionless searches'" (quoting *Chandler v. Miller*, 520 U.S. 305, 309 (1997))). At the time, both the Supreme Court and the Second Circuit had repeatedly explained that, for a suspicionless seizure program to be lawful, law enforcement must articulate a special need other than crime control and establish a reasonable program narrowly tailored to that need. *See Lidster*, 540 U.S. at 427 (affirming the need for suspicionless checkpoints stops to be reasonable to pass constitutional muster); *Edmond*, 531 U.S. at 37 ("While [individualized] suspicion is not an 'irreducible' component of reasonableness, we have recognized only limited circumstances in which the usual rule does not apply." (collecting cases)); *Sitz*, 496 U.S. at 450 ("[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint. The question thus becomes whether such seizures are 'reasonable' under the Fourth Amendment."); *Maxwell v. City of New York*, 102 F.3d 664, 667 (2d Cir. 1996) ("The reasonableness of a seizure at a vehicle checkpoint depends upon a balancing of [interests]."); *Wagner v. Swarts*, 827 F. Supp. 2d 85, 101 (N.D.N.Y. 2011) (addressing qualified immunity from liability for suspicionless motorcycle checkpoints and noting that "the issue here is not whether [the plaintiff's] right was clearly established — as rights protected by the Fourth Amendment are well settled"), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

The law is clear that "the Supreme Court and this Circuit have recognized, with reasonable specificity, the right of a motorist to be free from being stopped by the operation of an

unreasonable checkpoint." *Mollica*, 229 F.3d at 371 (citations and internal quotations marks omitted). Accordingly, the Court finds that the rights at issue were clearly established at the time the Individual Defendants operated the Step-Out Enforcement Checkpoints.

### ii. Defendants' actions were not objectively reasonable

Because Plaintiffs' rights were clearly established, the Court must determine whether Defendants' actions were objectively reasonable. Based on the allegations in the Amended Complaint, the Court cannot conclude that Defendants are entitled to qualified immunity at this stage of the litigation. A lawful primary purpose for the Step-Out Enforcement Checkpoints is not apparent from the allegations in the Amended Complaint. Reading the Amended Complaint in the light most favorable to Plaintiffs and drawing "all reasonable inferences from the facts alleged, not only those that support [Plaintiffs'] claim, but also those that defeat the immunity defense," *Hyman*, --- F. App'x at ---, 2015 WL 7147455, at *1 (quoting *McKenna*, 386 F.3d at 436), certain facts suggest that the primary purpose of the Step Out Enforcement Checkpoints were merely to uncover evidence of ordinary criminal wrongdoing by motorists traveling on the service ramp to the Long Island Expressway.

As alleged in the Amended Complaint, after forcing motorists to slow or stop their vehicles, officers approached the motorists and probed them about their names, destinations and sobriety. (Am. Compl. ¶¶ 65(d)–(i), 78, 107, 138.) In each case, the questioning officer simultaneously shined a flashlight into the vehicles' windows, "attempting to look at the contents inside." (*Id.* ¶¶ 65(j), 79, 108, 139.) Plaintiffs allege that they were ordered to exit their vehicles, and were searched and subjected to Breathalyzer tests. (*Id.* ¶¶ 80, 109, 140.) The Amended Complaint alleges that, at least as to Augustine, Defendant Luti claimed that the stop was pursuant to a "safety checkpoint." (*Id.* ¶ 145.) The questions about motorists' sobriety

appear to be consistent with a safety-related purpose. However, even assuming that safety was one of the purposes of the Step-Out Enforcement Checkpoints, it is not clear from Plaintiffs' allegations that safety was the primary purpose of the Step-Out Enforcement Checkpoints. Accordingly, construing the factual allegations in Plaintiffs' favor, it is not clear that a reasonable officer could have believed that there was a lawful primary purpose for the Step-Out Enforcement Checkpoint.

Moreover, even if an officer could have reasonably believed there was a lawful primary purpose for the Step-Out Enforcement Checkpoints, at this stage, Plaintiffs' allegations regarding the operation of the checkpoints preclude a finding that the program was justified as a reasonable intrusion on Plaintiffs' Fourth Amendment rights. As alleged in the Amended Complaint, the Step-Out Enforcement Checkpoints lacked any of the hallmarks of a narrowly tailored suspicionless search and seizure program. First, motorists lacked any advance notice of the program. (*Id.* ¶¶ 65(c)–(e), 75, 99, 127); *cf. Martinez-Fuerte*, 428 U.S. at 559 ("Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere."). Indeed, motorists were not alerted to the program even as they approached the checkpoint, because of the program's covert nature. As Plaintiffs allege, the Individual Defendants did not use any visible signs of law enforcement's operation, including lights, cones or flares. (Am. Compl. ¶¶ 75, 101, 133.) Instead, the Individual Defendants used unmarked law enforcement vehicles to create an apparent road hazard on a dimly-lit one-lane road so that motorists were forced to slow down or stop. (*Id.* ¶¶ 65(e)–(f), 74–75, 100–101, 132–33.); *cf. Martinez-Fuerte*, 428 U.S. at 558 (noting that while the approach of roving patrols at night "may frighten motorists[,] [a]t traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers'

authority, and he is much less likely to be frightened or annoyed by the intrusion").

Second, in addition to the lack of notice given to motorists, the Amended Complaint alleges that the officers had "complete discretion to stop vehicles as they choose." (Am. Compl. ¶ 65(k).) Because the officers were afforded such complete discretion at the Step-Out Enforcement Checkpoints, no reasonable officer could believe his or her seizures pursuant to the Step-Out Enforcement Checkpoints comported with the requirements for lawful checkpoints. *See Delaware v. Prouse*, 440 U.S. 648, 661 (1979) ("[S]tandardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." (collecting cases)); *cf. Lidster*, 540 U.S. at 428 (affirming the legality of a vehicle checkpoint and noting that "[t]he police stopped all vehicles systematically"); *MacWade*, 460 F.3d at 273 ("[P]olice exercise no discretion in selecting whom to search, but rather employ a formula that ensures they do not arbitrarily exercise their authority.").

Based on the allegations in the Amended Complaint, the Individual Defendants are not entitled to qualified immunity at this time. Discovery may resolve or illuminate the primary purpose and operation of the checkpoints, but neither Plaintiffs nor Defendants have presented such information at this stage of the litigation. Accordingly, the Court denies Defendants qualified immunity on their motion to dismiss.

### d. False arrest

Defendants move to dismiss McLennon's and Augustine's false arrest claims, asserting that their claims fail as a matter of law.[5] (Defs. Mem. 8–9.)

---

[5] Defendants do not move to dismiss Price's false arrest claim. Accordingly, that claim will proceed.

In assessing section 1983 claims for false arrest, courts look to the law of the state in which the arrest occurred. *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) ("A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law."); *see also Russo*, 479 F.3d at 203. "Under New York law, 'to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003)).

"[P]robable cause is a complete defense to false arrest claims." *Simpson*, 793 F.3d at 265; *see also Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (citations omitted); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "An arresting officer has probable cause when the officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Simpson*, 793 F.3d at 265 (quoting *Weyant*, 101 F.3d at 852); *see also Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (same).

A defendant bears the burden of raising and proving the existence of probable cause for a plaintiff's arrest. *See Dickerson*, 604 F.3d at 751 (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("The defendant has the burden of raising and proving the affirmative defense of probable cause." (citations omitted)). While this defense is "normally asserted in an answer," *Silver v. Kuehbeck*, 217 F. App'x 18, 22 (2d Cir. 2007) (quoting *McKenna*, 386 F.3d at 435), it may nevertheless warrant dismissal on a pre-answer motion to dismiss where probable cause "appears on the face of the complaint," *id.* (first citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); and then

citing 5A Wright & Miller, *Federal Practice and Procedure* § 1277).

"[A] conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause" sufficient to preclude a false arrest claim. *See Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986). This is true even where the conviction arises from a guilty plea. *See McNeill v. People of City & State*, No. 06-CV-4843, 2006 WL 3050867, at *3 (E.D.N.Y. Oct. 24, 2006) ("Since a guilty plea is the equivalent of a conviction [Plaintiff's] claims under § 1983 must fail."), *aff'd sub nom. McNeill v. People of City & State of New York*, 242 F. App'x 777 (2d Cir. 2007); *see Maietta v. Artuz*, 84 F.3d 100, 103 n.1 (2d Cir. 1996) ("[C]ommon law principles preclude a challenge to the validity of an arrest after a guilty plea, for purposes of a civil suit under 42 U.S.C. § 1983." (citations omitted)). Importantly, "a guilty plea, even if to a lesser included offense under a charged violation, is fatal to a false arrest claim." *Tretola v. Cty. of Nassau*, 14 F. Supp. 3d 58, 68–69 (E.D.N.Y. 2014); *Papeskov v. Brown*, No. 97-CV-5351, 1998 WL 299892, at *5 (S.D.N.Y. June 8, 1998) ("[A] plea of guilty, even to a charge lesser than that for which the plaintiff was arrested, bars a § 1983 action.") (Sotomayor, J.) (collecting cases), *aff'd*, 173 F.3d 845 (2d Cir. 1999).

### i. McLennon

Defendants assert that McLennon's false arrest claim fails as a matter of law because, even if the initial stop was unlawful, there was independent probable cause for McLennon's arrest because he failed two Breathalyzer tests and was driving without a valid driver's license. (Defs. Mem. 8.) Defendants concede that these facts are not in the Amended Complaint, and they instead rely on the criminal complaint from McLennon's criminal case and the findings of fact from Judge Zaro's July 21, 2012 decision in *People v. McLennon* ("Judge Zaro's July 21, 2012 Decision"). (*Id.* at 3–4.) Defendants assert that the Court may consider these documents

because the Amended Complaint "incorporates by reference McLennon's underlying criminal case, including the decision issued by Judge Zaro and the records relating to that decision and the underlying criminal case."  (*Id.* at 3–4, 7.)  McLennon responds that nothing on the face of the Amended Complaint supports Defendants' affirmative defense as there are no allegations about McLennon's Breathalyzers or driver's license status.  (Pl. Opp'n 12.)

The Court first determines which documents may be considered on this motion to dismiss and then considers whether the documents entitled to consideration establish Defendants' affirmative defense.

### 1.  Defendants' proffered extraneous documents

As noted above, in deciding a motion under Rule 12(b)(6), the Court must consider the Amended Complaint's allegations along with "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *L-7 Designs*, 647 F.3d at 422 (quoting *Sira*, 380 F.3d at 67).  "To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'"  *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).  "Limited quotation does not constitute incorporation by reference."  *Looney v. Black*, 702 F.3d 701, 716 n.2 (2d Cir. 2012) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

Even where a document is not incorporated by reference, it may be considered if it is integral to the complaint.  *L-7 Designs*, 647 F.3d at 422 ("A complaint is [also] deemed to include . . . documents that, although not incorporated by reference, are 'integral' to the complaint." (quoting *Sira*, 380 F.3d at 67)).  A document is integral to the complaint where the

plaintiff (1) has "actual notice" of the document and its information and (2) has "relied upon the[] documents in framing the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). However, "[a] document is not 'integral' simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff *relied* on the document in preparing his complaint." *Williams v. City of New York*, No. 14-CV-5123, 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015).

In resolving motions to dismiss, district courts in this Circuit have found documents from a plaintiff's underlying criminal case, including criminal complaints, to be "integral" to the plaintiff's complaint. *See Bond v. City of New York*, No. 14-CV-2431, 2015 WL 5719706, at *2 (E.D.N.Y. Sept. 28, 2015) (holding without discussion that a state court criminal complaint and grand jury indictment were "both integral to the complaint" which alleged claims including false arrest and malicious prosecution (citations omitted)); *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *3 (S.D.N.Y. Jan. 24, 2013) (considering domestic incident report and "the accusatory instrument" from the plaintiff's underlying criminal case in deciding motion to dismiss false arrest and malicious prosecution claims because "both documents [were] uncontested in validity, integral to [the complaint], and available to both parties"), *aff'd on qualified immunity grounds*, 751 F.3d 78 (2d Cir. 2014); *Obilo v. City Univ. of N.Y.*, No. 01-CV-5118, 2003 WL 1809471, at *4 (E.D.N.Y. Apr. 7, 2003) (incorporating a police incident report and criminal complaint where the plaintiff's false arrest and malicious prosecution claims asserted that law enforcement improperly relied on "conspiratorial" allegations, which the court found was "an implicit reference" to allegations in the police report and criminal complaint).

Although these courts have found criminal complaints to be integral to complaints

alleging false arrest or malicious prosecution claims, "[t]he better view, adopted by a majority of courts in our Circuit, is that these kinds of police records are not 'integral' to a false arrest complaint." *Williams*, 2015 WL 4461716, at *2 (collecting cases). This conclusion follows from an important difference between a criminal complaint and documents typically deemed integral to a civil complaint. As the Second Circuit noted, "in most instances" where a document is purportedly integral to a complaint, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint." *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157 (citation omitted). A criminal complaint is not a document imposing legal obligations "upon which [Plaintiff's Amended Complaint] stands or falls." *Id.*

Other courts in this Circuit have reached the same conclusion regarding criminal complaints and have refused to treat them as integral to a complaint that alleges false arrest or malicious prosecution claims. *See Williams*, 2015 WL 4461716, at *2 (refusing to consider arrest report and criminal complaint in assessing a motion to dismiss claims including false arrest and malicious prosecution, finding that "[the] plaintiff relie[d] on his own perceptions and recollections" in drafting the complaint and noting that "it is not beyond dispute that the police report is a truthful description of the police officers' basis to arrest plaintiff" and "[t]o accept the truth of the documents offered by defendants at this stage would amount to a premature determination that the arresting officers are more credible than plaintiff"); *Alvarez v. Cty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 396 (S.D.N.Y. 2015) ("The Court will not consider the Incident Report, depositions, or the Misdemeanor Complaint, as there is no indication in the record that Plaintiff relied on them in drafting the Amended Complaint." (citations and internal

quotation marks omitted)); *Weaver v. City of New York*, No. 13-CV-20, 2014 WL 950041, at *3 (E.D.N.Y. Mar. 11, 2014) ("This Court is not persuaded . . . that Second Circuit precedent permits consideration of an arrest report on a 12(b)(6) motion." (first citing *Chambers*, 282 F.3d at 153; and then citing *Global Network Commc'ns, Inc.*, 458 F.3d at 156–57)); *see also Jones v. Rivera*, No. 13-CV-1042, 2015 WL 8362766, at *3 (S.D.N.Y. Dec. 7, 2015) ("Neither the police report nor the Misdemeanor Information appear to be integral to the allegations made in the Amended Complaint."); *Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 31, 2015) ("Plaintiff does not mention [the arrest report and criminal complaint] and does not appear to rely on them, the court cannot deem such extrinsic materials to be integral to the Complaint in considering a 12(b)(6) motion to dismiss." (citations omitted)); *Martin v. Cty. of Nassau*, 692 F. Supp. 2d 282, 289 (E.D.N.Y. 2010) (refusing to consider police reports and witness statements in assessing claims including false arrest and malicious prosecution where "in framing his complaint[,] the plaintiff did not rely upon the documents").

Here, contrary to Defendants' assertion, the entirety of McLennon's underlying criminal case has not been incorporated by reference into the Amended Complaint. Defendants cite no support for their argument that all documents related to McLennon's criminal case are necessarily incorporated by reference into this section 1983 action. However, despite stating that broad proposition, Defendants rely on only two extraneous documents in raising their affirmative defense: McLennon's criminal court complaint and Judge Zaro's July 21, 2012 Decision. McLennon does reference some extraneous documents in the Amended Complaint: (1) Judge Zaro's July 21, 2012 Decision finding the vehicle checkpoint to be unconstitutional, (Am. Compl. ¶ 88); (2) the four other Queens Criminal Court Decision finding other vehicle checkpoints to be unconstitutional, (*id.* ¶¶ 91–92); and (3) the criminal court complaint allegedly

signed by Defendant Penney, (*id.* ¶ 84).

As to McLennon's criminal court complaint, the Amended Complaint makes, at most, a passing reference to this document in alleging that Defendant Penney signed the complaint and listed a false and pretextual basis for McLennon's stop. (*Id.* ¶ 84 ("Officer Penney signed the criminal court complaint against Mr. McLennon claiming, as a pretext for the stop, that McLennon had violated the Vehicle and Traffic Law by having air fresheners hanging from his rear view mirror.").) This reference is insufficient to render the McLennon's entire criminal complaint incorporated by reference into the Amended Complaint. *Looney*, 702 F.3d at 716 n.2 ("Limited quotation does not constitute incorporation by reference.").

Nor is McLennon's criminal complaint integral to the Amended Complaint. Although McLennon had notice of the criminal complaint, (Am. Compl. ¶ 84), McLennon has not relied on the criminal complaint in framing his claims in the Amended Complaint, a requirement for integration, *see Glob. Network Commc'ns, Inc.*, 458 F.3d at 156 ("[A] necessary prerequisite for [a document to be integral] is that the 'plaintiff[ ] *rel*[*y*] on the terms and effect of [the] document in drafting the complaint . . . , mere notice or possession is not enough." (third, fourth and fifth alterations in original) (quoting *Chambers*, 282 F.3d at 153)). The Amended Complaint's unlawful stop, false arrest and malicious prosecution claims flow from McLennon's own recollection of the Step-Out Enforcement Checkpoints, not on any information from the criminal complaint. (Am. Compl. ¶¶ 70–90.) Although McLennon's criminal complaint may be relevant to his claim, it is not integral to the Amended Complaint.

Because it is not apparent that McLennon relied on the criminal complaint in drafting the Amended Complaint, the Court will not consider it. In reaching this conclusion, the Court notes that although some courts have deemed criminal complaints to be integral, those decisions are

distinguishable from this case and appear to overlook the Second Circuit's notice and reliance requirements for integral documents. In *Betts*, the court deemed a criminal complaint and other extraneous documents to be "integral" merely because they "provide[d] crucial details associated with [the plaintiff's] allegations." *Betts*, 2013 WL 311124, at *3. In *Abdul-Rahman*, the court considered documents including a criminal complaint "because plaintiff had possession of these documents, incorporated them by reference in the [c]omplaint," and did not question their "authenticity." *Abdul-Rahman*, 2012 WL 1077762, at *3. In *Bond*, after recounting the controlling law as to integral documents, the court concluded without discussion that the criminal complaint was integral. *Bond*, 2015 WL 5719706, at *2 (E.D.N.Y. Sept. 28, 2015).

As noted above, although some courts have found criminal complaints integral to the complaint, "[t]he better view, adopted by a majority of courts in our Circuit, is that these kinds of police records are not 'integral' to a false arrest complaint." *Williams*, 2015 WL 4461716, at *2 (collecting cases). In line with the Second Circuit's reasoning when explaining the type of documents that are typically deemed integral to a complaint, a criminal complaint is not a document imposing legal obligations "upon which [the Amended Complaint] stands or falls." *Glob. Networks Commc'ns, Inc.*, 458 F.3d at 157; *see Alvarez*, 95 F. Supp. 3d at 396. Because McLennon did not rely on the terms or effect of the criminal complaint in framing Amended Complaint, the Court declines to consider it as integral to the Amended Complaint.

Defendants correctly note that given Plaintiffs' extensive reliance on Judge Zaro's July 21, 2012 Decision in framing their claims, it has been incorporated by reference into the Amended Complaint. (*See* Am. Compl. ¶¶ 5, 86–88, 91.) However, Defendants overstate the significance of the decision's incorporation. While the Court may accept the fact that Judge Zaro's opinion cited to the testimony of officers who stated that McLennon was intoxicated and

lacked a valid driver's license that does not mean that the Court, on a motion to dismiss, must accept that testimony as true. As the Second Circuit recently noted, "at the pleading stage, although we must consider the words on the page (that is, we cannot disregard the fact that the [extraneous] reports make particular findings), we need not consider the truth of those words to the extent disputed by [the] [p]laintiff." *Turkmen v. Hasty*, 789 F.3d 218, 226 n.6 (2d Cir. 2015) (citations omitted). Indeed, in opposing Defendants' motion, McLennon disputes precisely the statements Defendants rely on to establish their affirmative probable cause defense, emphasizing that the officers' testimony and related statements concerning McLennon's lack of a valid driver's license and intoxication are merely unproven allegations. (Pl. Opp'n 11–12.) In these circumstances, while the Court may accept that Judge Zaro's opinion included findings of fact concerning McLennon's license and Breathalyzer results, there is no basis for the Court to accept the truth of those findings.

### 2. Defendants' affirmative defense to McLennon's false arrest claim fails at this stage

Accepting the Amended Complaint's allegations as true, and drawing all reasonable inferences in McLennon's favor, Defendants have not met their burden to establish that, based on the totality of the circumstances, McLennon's arrest was supported by probable cause. The Amended Complaint contains few facts regarding McLennon's arrest following his suspicionless stop. McLennon asserts that after the stop, he was searched, subjected to a Breathalyzer and then arrested for an unspecified violation of the New York Vehicle and Traffic Law. (Am. Compl. ¶¶ 78–83, 168.) According to McLennon, his arrest was unlawful, and the totality of the circumstances as known to the officers at the time of the arrest falls short of establishing the legality of that arrest. Plaintiffs do not allege, and Defendants do not contend, that McLennon was stopped based on probable cause or reasonable suspicion. Nevertheless, shortly after

stopping McLennon without any articulable suspicion, Defendants seized him. It is not apparent from the Amended Complaint that any circumstance changed between the initial stop and the subsequent arrest, let alone anything that would support a finding of probable cause for a violation of the New York Vehicle and Traffic law or any other violation.

As with Defendants' qualified immunity arguments, discovery may illuminate the surrounding circumstances unavailable on this motion to dismiss. However, at this stage, because Defendants' probable cause defense is not apparent from the face of the Amended Complaint, the Court denies their motion to dismiss McLennon's false arrest claim.

### ii. Augustine's false arrest claim is barred by his guilty plea

The Court dismisses Augustine's false arrest claim in light of his guilty plea. "[A] guilty plea, even if to a lesser included offense under a charged violation, is fatal to a false arrest claim." *Tretola*, 14 F. Supp. 3d at 68–69; *see also Timmins v. Toto*, 91 F. App'x 165, 166 (2d Cir. 2004) (Plaintiff "cannot establish a constitutional violation for claims of false arrest or malicious prosecution because he pleaded guilty to disorderly conduct in exchange for the dismissal of the other charges brought against him in New York."); *Horvath v. City of New York*, No. 12-CV-6005, 2015 WL 1757759, at *3 (E.D.N.Y. Apr. 17, 2015) ("By pleading guilty 'to one count of disorderly conduct in full satisfaction of the charges that stemmed from [the two] arrests . . . [plaintiff] cannot challenge the validity of his two arrests' and therefore 'any claims for false arrest . . . are meritless.'" (alterations in original) (citations omitted)); *Hope v. City of New York*, No. 08-CV-5022, 2010 WL 331678, at *2 (E.D.N.Y. Jan. 22, 2010) ("A valid prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest, even if the conviction is the result of a guilty plea to a lesser charge than that for which plaintiff was arrested." (internal citations omitted)).

Here, as stated in the Amended Complaint, "Augustine pled [guilty] to disorderly conduct to resolve the Vehicle and Traffic Law infractions charged against him without the need to make repeated court appearances." (Am. Compl. ¶ 146.) Augustine does not dispute or challenge the voluntariness or validity of that guilty plea. As a result, that plea forecloses his false arrest claim by establishing probable cause for his arrest. While Augustine asserts that he pleaded guilty only to disorderly conduct rather than the traffic violation for which he was arrested, as alleged in the Amended Complaint, his plea was in satisfaction of all the charges against him. This bars his claim. The Court therefore dismisses Augustine's false arrest claim.

### e. Malicious prosecution claim — McLennon[6]

Defendants seek dismissal of McLennon's malicious prosecution claim, pointing to extraneous facts regarding McLennon's alleged intoxication and lack of a valid driver's license. (Defs. Mem. 10–11.) According to Defendants, those facts support probable cause to prosecute McLennon even if the initial stop was unlawful because the fruit of the poisonous tree doctrine does not apply to malicious prosecution claims. (*Id.*) In opposition, McLennon argues that the fruit of the poisonous tree doctrine applies to malicious prosecution claims. (Pl. Opp'n 15–16.)

"[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations and internal quotation marks omitted). Under New York law, the elements of a malicious prosecution claim are "(1) the initiation or

---

[6] In responding to Defendants' motion to dismiss, Plaintiffs Augustine and Price "concede[d] that the criminal proceedings against them were not terminated in their favor, and therefore withdr[e]w their individual malicious prosecution claims." (Pls. Opp'n 14.) Accordingly, the Court dismisses Augustine and Price's malicious prosecution claims against all Defendants.

continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) (quoting *Manganiello*, 612 F.3d at 161). In a claim for malicious prosecution under section 1983, "the plaintiff must also show 'that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 375 (S.D.N.Y. 2015) (alteration in original) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

Here, McLennon's malicious prosecution claim fails because he fails to allege that his prosecution was not supported by probable cause. McLennon appears to rely solely on his unlawful stop and arrest without probable cause to sustain a malicious prosecution claim. However, while false arrest and malicious prosecution "are kindred actions, each protects a different personal interest and is composed of different elements." *Broughton*, 37 N.Y.2d at 456. Unlike a false arrest claim, the lack of probable cause is an element of his malicious prosecution claim, which McLennon must affirmatively plead. *Id.* at 457. ("Where the plaintiff institutes a malicious prosecution action he must plead the lack of probable cause."); *cf. Hall v. Brown*, 489 F. Supp. 2d 166, 173 (N.D.N.Y. 2007) ("Unlike malicious prosecution, a claim for false arrest does not require a plaintiff to plead a lack of probable cause."). There are no facts alleged in the Amended Complaint to plausibly sustain this element.

The Amended Complaint recounts McLennon's unlawful stop in detail, (Am. Compl. ¶¶ 70–83), but allegations concerning McLennon's subsequent prosecution are few. Specifically, the Amended Complaint alleges that after McLennon's unlawful stop and arrest, he was arraigned on violations of the New York Vehicle and Traffic Law, released on his own

recognizance, (*id.* ¶¶ 83, 85), and, "[o]n November 21, 2012, Mr. McLennon's case was dismissed and sealed," (*id.* ¶ 89). The Amended Complaint also alleges, conclusorily that "[a]s a result of []McLennon's unlawful stop, arrest, imprisonment and malicious prosecution he suffered" various harms. (*Id.* ¶ 90.) While these allegations may sufficiently allege the first two elements of his malicious prosecution claim — the initiation of a criminal proceeding against McLennon and the termination of that proceeding in his favor — he fails to present facts plausibly suggesting a lack of probable cause for commencing the criminal proceeding. Accordingly, the Court dismisses this claim.[7]

### f. Municipal liability

Defendants move to dismiss Plaintiffs' claim for municipal liability, arguing that Plaintiffs each fail to plead any theory for municipal liability. (Defs. Mem. 13.)

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *See Iacovangelo v. Corr.*

---

[7] Because McLennon fails to allege a lack of probable cause, the Court need not address whether the fruit of the poisonous tree doctrine applies to his claim.

*Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.'" *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015) (internal citations omitted) (first citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); and then citing *Iqbal*, 556 U.S. at 678). To survive a motion to dismiss a municipal liability claim, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

Here, aside from conclusory assertions that the challenged conduct arose from a "practice, policy, and/or custom," (Am. Compl. ¶ 65), Plaintiffs do not allege that the Step-Out Enforcement Checkpoints were carried out pursuant to a formal policy, or that they were explicitly ratified by a policy-maker. Rather, Plaintiffs appear to assert multiple theories of municipal liability: (1) a widespread practice sufficient to constitute a policy or custom; (2) a ratified policy or custom based on the encouragement and public praise of officers conducting the vehicle checkpoints; (3) a failure to train officers as to unlawful stops; and (4) a failure to supervise or discipline officers despite having notice of unlawful stops. (*Id.* ¶¶ 149–56.) The

Court considers the allegations as to each theory.

### i. Widespread practice

As noted above, a plaintiff "need not identify an express rule or regulation," to impose municipal liability, but can show that the practice "of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law." *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)). In other words, a plaintiff can show that there is "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1986)). "[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones*, 691 F.3d at 81 (citations omitted). Indeed, "before the actions of subordinate city employees can give rise to § 1983 liability, their [unlawful] practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992) (citations omitted).

There is no set number of incidents that make a practice "widespread," and courts have found a wide range of instances insufficient to plausibly allege a municipal custom. *See Jones*, 691 F.3d at 85 (finding that the plaintiff showed "two instances, or at the most three" cases of unconstitutional conduct by a "small number of officers" that occurred "over a period of several years," which "fell far short of showing a policy, custom, or usage of officers" or conduct "so persistent that it must have been known to supervisory authorities"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding

that the "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted)); *Cruz v. City of New York*, No. 15-CV-2265, 2016 WL 234853, at *5 (S.D.N.Y. Jan. 19, 2016) ("[E]ight cases cited from a municipality (New York) far bigger than Newburgh, makes the number of cited cases particularly inadequate to demonstrate plausibly a municipal custom."); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (finding thirteen instances of similar excessive force allegations over a four year period were insufficient to state a custom where, during that time period "hundreds, if not thousands, of arrests were made").

Here, while Plaintiffs point to their stops and to the four other stops found to be unconstitutional in *Nandall*, *Rakitzis*, *Perez* and *Garcia* (collectively the "Queens Criminal Court Decisions"), Plaintiffs have not plausibly alleged that unlawful searches and seizures from the Step-Out Enforcement Checkpoints are so widespread as to constitute a municipal custom. Setting aside Plaintiffs' conclusory allegations that there have been "hundreds" of other unlawful stops pursuant to similar checkpoints,[8] (Am. Compl. ¶¶ 1 47, 152, 157–58), Plaintiffs plausibly allege only six incidents of unlawful seizures pursuant to the Step-Out Enforcement Checkpoints — those of McLennon, Augustine and Price and the incidents at issue in the Queens Criminal Court Decisions. (*Id.* ¶ 91.)

In certain respects the allegations based on the Queens Criminal Court Decisions offer stronger support for Plaintiffs' municipal liability claim than allegations in other cases where a

---

[8]   In describing the contours of the putative class, Plaintiffs allege that "publicly available information" reveals that "hundreds of people have been arrested following stops at such unconstitutional checkpoints on the streets, highways, thoroughfares, and service ramps in the City of New York." (Am. Compl. ¶ 47.)  However, Plaintiffs neither provide a citation to, nor attach, this publicly available information.

plaintiff points to other civil complaints of unconstitutional conduct to establish municipal liability. *See Cruz*, 2016 WL 234853, at *5 (finding plaintiff's reliance on five civil cases asserting false arrest and malicious prosecution claims insufficient to establish a custom or policy for *Monell* purposes as "[a]ll of the cases cited settled short of adjudication on the merits"); *Tieman*, 2015 WL 1379652, at *17 (finding "unsubstantiated allegations in lawsuits and complaints" in other actions "not persuasive" for purposes of alleging a widespread policy or custom). Unlike civil lawsuits or settlements with unsubstantiated allegations, the Queens Criminal Court Decisions involve judicial findings of unconstitutional conduct. These decisions provide more support for Plaintiffs' claims than unsupported allegations in civil complaints.

However, irrespective of the support these decisions provide, Plaintiffs still cite only a handful of decisions, all of which involve conduct by Highway Patrol Unit 3 at the same location. Even assuming that the officers engaged in the same conduct in each case, it does not follow that unlawful vehicle checkpoint seizures were so widespread as to constitute a municipal policy or custom. *Rubio v. Cty. of Suffolk*, 328 F. App'x 36, 38 (2d Cir. 2009) ("[A] few violations by a small group of subordinate County employees with no policymaking authority [cannot] amount to the pervasive and widespread custom or practice necessary for municipal liability." (alteration in original)). To draw an inference of a municipal policy from the unconstitutional conduct of this select group of officers from one law enforcement unit would stretch Plaintiffs' allegations too far. Although Plaintiffs plausibly allege that there was unconstitutional conduct by individuals in Highway Patrol Unit 3, they fail to allege corresponding facts from which the Court can infer that such conduct was pursuant to an

informal municipal policy or custom.[9]

### ii. Ratification

The Amended Complaint alleges that the Municipal Defendants' implicitly ratified the unconstitutional conduct alleged by encouraging such conduct through the "commendations and public praise" of the officers committing the unconstitutional conduct. (Am. Compl. ¶¶ 156, 166, 169.)

Municipal liability may be imposed based on a policymaking official's implied ratification of low-level employees' unconstitutional conduct. *See Jones*, 691 F.3d at 81 ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions — either expressly or tacitly."). Because "the disposition of the policymaker may be inferred from his conduct after the events giving rise to the constitutional violation," *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (brackets omitted) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985)), a policymaker's implicit ratification may be established by his or her reward or encouragement of the unlawful conduct, *see Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983) ("[T]he complaint arguably satisfies the requirement that it allege the first of the foregoing three essential elements, the existence of an official policy or custom, by alleging that the City, acting by its Board of Police

---

[9]  Although the geographically isolated nature of the allegations do not support Plaintiff's custom or policy theory, the allegations are nevertheless relevant to Plaintiffs' other theories of municipal liability. Indeed, the repeated use of unlawful checkpoints — whether isolated or not — may be considered in connection with Plaintiff's failure to train, supervise or discipline theories. *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015) (finding that although civil complaints cited by the plaintiff were not widespread enough to establish a municipal policy or custom, those complaints plausibly established that "the need for more or better supervision was obvious" for purposes of the plaintiff's failure to train claim).

Commissioners and police department, repeatedly condoned and even rewarded police conduct that had been adjudicated to be in violation of civil rights.").

Here, Plaintiffs allege that, after the Legal Aid Society served the *McLennon* and *Rakitzis* decisions on the NYPD and Highway Patrol Unit 3, "the Highway Patrol Officers who conduct[ed] [the] illegal suspicionless checkpoint stops" at issue were rewarded "with official commendations, public praise and/or other recognition." (Am. Compl. ¶ 94.) While these allegations may demonstrate the municipality's notice of unlawful conduct by officers from Highway Patrol Unit 3, the Amended Complaint fails to plausibly allege that, through the subsequent commendations, policymakers implicitly ratified that conduct. Plaintiffs plead no connection between the alleged commendations and the unlawful seizures undertaken by the officers. In *Batista*, the plaintiff alleged that police were rewarded specifically for their unconstitutional conduct, which satisfied the official policy or custom requirement. *Batista*, 702 F.2d at 397. Here, by contrast, Plaintiffs merely plead that at some point after Legal Aid served the NYPD with the decisions in *McLennon* and *Rakitzis*, the officers who committed the constitutional violations received "official commendations, public praise and/or other recognition" generally. (Am. Compl. ¶¶ 93–94.)

Allegations that an individual officer who acted unconstitutionally was subsequently rewarded does not illuminate a municipality's view of that officer's unconstitutional conduct without an allegation of a further connection between the unconstitutional conduct and the award. Municipal liability will be imposed where a plaintiff demonstrates that the municipality ratified — implicitly or explicitly — the unconstitutional conduct or program at issue. *See Davis v. City of New York*, 228 F. Supp. 2d 327, 341 (S.D.N.Y. 2002) ("[A] plaintiff cannot just prove that the final policymaking authority . . . knew of the adverse action. . . . The plaintiff must also

prove that the final policymaking authority knew that the subordinates took that action for unconstitutional reasons."), *aff'd*, 75 F. App'x 827, 829 (2d Cir. 2003) ("Where . . . liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified the 'subordinate's decision and the basis for it.'" (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988))).  As currently pleaded, the Amended Complaint does not support the inference that, because the highway patrol officers received commendations for conduct that may have been wholly unrelated to their unconstitutional conduct, policymakers implicitly ratified that unconstitutional conduct.  Without sufficient facts to support an inference that such a connection is plausible, Plaintiffs have failed to plead municipal ratification sufficient to establish municipal liability.

### iii.  Failure to train

"[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need."  *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  To show deliberate indifference, a plaintiff must allege facts plausibly showing that (1) "a policymaker [knew] 'to a moral certainty' that city employees will confront a particular situation;" (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;'" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  *Wray*, 490 F.3d at 195–96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *see Reynolds*, 506 F.3d at 192 (same).

"[W]here . . . a city has a training program, a plaintiff must . . . 'identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation.'" *Wray*, 490 F.3d at 196 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting *Canton*, 489 U.S. at 390–91).

Here, Plaintiffs fail to allege facts plausibly stating a failure to train claim. Plaintiffs include no allegations about relevant officer training programs, or the lack thereof, for the use of vehicle checkpoints. Instead, Plaintiffs rely on the same conclusory allegation throughout — that the Municipal Defendants failed to properly train NYPD officers "knowing that such failures would result in Fourth and Fourteenth Amendment violations." (Am. Compl. ¶ 151.) This general and conclusory allegation is insufficient to plausibly allege "a specific deficiency in the city's training program . . . [that] is closely related to [the] ultimate injury, such that it 'actually caused' [Plaintiff's] constitutional deprivation. *See Wray*, 490 F.3d at 196. Accordingly, Plaintiffs have failed to state a claim for municipal liability based on a failure to train theory.

### iv.   Failure to supervise or discipline

A failure to "supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees

interact." *Wray*, 490 F.3d at 195–96 (quoting *Canton*, 489 U.S. at 388). Similarly, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista*, 702 F.2d at 397 (collecting cases). "Where plaintiffs seek to hold a municipality liable under a theory of failure to supervise or discipline, . . . they must also show that the municipal policymaker acted with deliberate indifference." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *Canton*, 489 U.S. at 388–89); *see Wray*, 490 F.3d at 195 ("The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." (citing *Canton*, 489 U.S. at 388)). Under that standard, "where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs," deliberate indifference "may be inferred." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations, alterations and internal quotation marks omitted).

### 1. McLennon

Defendants assert that, given the timing of McLennon's allegedly unlawful stop, he cannot plead a municipal liability claim based on deliberate indifference. (Defs. Mem. 14.) Defendants argue that because the NYPD and Highway Patrol Unit 3 were not served with the *McLennon* and *Rakitzis* decisions until after McLennon's stop and arrest, it is impossible for the Municipal Defendants to have had notice of those decisions prior to McLennon's stop and arrest. (*Id.* at 14–15.)

The Court agrees that McLennon has failed to plead a municipal liability claim based on

a failure to supervise or discipline theory. McLennon's unlawful stop occurred on October 28, 2011, and preceded the four other unlawful stops at issue in the Queens Criminal Court Decisions, including Augustine's and Price's unlawful stops and Legal Aid's service of *McLennon* and *Rakitzis* on the NYPD. (Am. Compl. ¶¶ 28, 31, 34, 91–93.) Legal Aid's service of the those decisions occurred after McLennon's unlawful stop. Although Plaintiffs allege that "[m]ore than one hundred prosecutions have been docketed in the Criminal Court, Queens County, since the practice of suspicionless, unregulated checkpoint stops was detected in 2011," (*id.* ¶ 8), those allegations, and other similar allegations, are conclusory and must be rejected, (*see id.* ¶¶ 1 47, 152, 157–58); *Iqbal*, 556 U.S. at 678. Plaintiffs allege no facts to support these statements or to allow a plausible inference that the unlawful practices experience by McLennon and documented in the four other Queens Criminal Court Decisions were occurring prior to McLennon's unlawful stop. Accordingly, McLennon's municipal liability claim for failure to supervise or discipline is dismissed.

### 2. Augustine and Price

While Defendants raise a lack of notice as to McLennon's deliberate indifference allegations, they do not advance this argument as to Augustine and Price's claims. Instead, Defendants note that Price's and Augustine's stops occurred "years after service of notice." (Defs. Mem. 16.)

Augustine and Price's claims do not suffer from the same deficiencies as McLennon's claim. The Amended Complaint alleges that Highway Patrol Unit 3 officers unlawfully stopped Price on June 13, 2014 and stopped Augustine on November 28, 2014. (Am. Compl. ¶¶ 96, 123.) By that time, judges of Queens County Criminal Court had decided the five Queens Criminal Court Decisions, finding the practice unconstitutional. (*Id.* ¶ 5.) As Defendants

concede, both the NYPD and Highway Patrol Unit 3 had been served with the decisions in *McLennon* and *Rakitzis*. (*Id.* ¶ 6; Defs. Mem. 16.) The allegations by Augustine and Price plausibly allege that, at the time of their stops, there had been an obvious and preexisting need to better supervise or discipline officers within Highway Patrol Unit 3, given the repeatedly documented and adjudicated incidents of the unconstitutional vehicle checkpoints. *See Osterhoudt v. City of New York*, No. 10-CV-3173, 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012) ("While plaintiff's citations to pending lawsuits and settlement agreements will 'not suffice to overcome summary judgment . . . they do permit a plausible inference' of deliberate indifference." (alteration in original) (quoting *Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011))).

As noted above, although Highway Patrol Unit 3's documented unconstitutional conduct may not be widespread enough to support Plaintiff's custom or policy theory, they are relevant to demonstrate the need for, or lack of, supervision and discipline. *See Tieman*, 2015 WL 1379652, at *20 (finding that although civil complaints cited by the plaintiff were not widespread enough to establish a municipal policy or custom, those complaints plausibly established that "the need for more or better supervision was obvious" for purposes of the plaintiff's failure to train claim). Accepting the Amended Complaint's allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Augustine and Price plausibly allege a failure to supervise or discipline theory of municipal liability. As alleged, the Municipal Defendants had actual or constructive notice of the Step-Out Enforcement Checkpoints that were repeatedly invalidated by Queens County judges. Despite receiving notice as early as August of 2012, in 2014, Augustine and Price were stopped at checkpoints that were nearly identical to the prior Step-Out Enforcement Checkpoints, and courts continued to find other Step-Out Enforcement Checkpoints to be

unconstitutional.  At this stage, the continuing nature of these stops coupled with the Municipal

Defendants' notice, raises a plausible inference that despite having notice, the Municipal

Defendants failed to act, by better supervising or disciplining the officers conducting the Step-

Out Enforcement Checkpoints.  Accordingly, Defendants' motion is denied as to Augustine's

and Price's municipal liability claims.

### g.   Supervisory liability — Chan, Tuller and Ciorra

The Supervisory Defendants move to dismiss Plaintiffs' claims arguing that Plaintiffs

have not alleged facts sufficient to establish their personal involvement in the underlying

constitutional violations.  (Defs. Mem. 17–20.)  The Supervisory Defendants argue that there are

no allegations of their direct involvement in Plaintiffs' unlawful stops or in any stops that are

part of the Queens Criminal Court Decisions.  (*Id.* at 19.)  In addition to arguing that they have

no direct involvement, the Supervisory Defendants also argue that there was no policy or

practice that they allowed to continue.  (*Id.* at 19–20.)

In response, Plaintiffs argue that the Amended Complaint plausibly alleges that the

Supervisory Defendants were "undoubtedly aware of the spike in arrests being made" pursuant

to the Step-Out Enforcement Checkpoints, and that the Supervisory Defendants rewarded

officers for the large number of wrongful arrests they were making at these checkpoints."  (Pl.

Opp'n 19–20.)  Further, Plaintiffs assert that despite Legal Aid's service of the decisions in

*McLennon* and *Rakitzis* on the NYPD and Highway Patrol Unit 3, the Supervisory Defendants

failed to "put an end to this practice of making illegal stops."  (*Id.* at 20.)

"A defendant's supervisory authority is insufficient in itself to demonstrate liability under

§ 1983."  *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (citing *Richardson v.*

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003)); *Richardson*, 347 F.3d at 435 ("[M]ere linkage in the

prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted)). Instead, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases). As the Second Circuit has stated, a supervisory defendant's personal involvement can be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (emphasis omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[10]

Accordingly, "supervisory liability may be imposed when an official has actual or constructive

---

[10] The Second Circuit has noted that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), "has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon* [*v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)]." *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012). In *Iqbal*, the Supreme Court indicated that personal involvement was required for supervisory liability, stating that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. In the years since *Iqbal* was decided, the Second Circuit has not resolved *Iqbal*'s effect, if any, on *Colon*. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (recognizing that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to reach the issue); *Reynolds*, 685 F.3d at 206 n.14. Following the approach taken by other courts in this Circuit, this Court will apply the *Colon* factors in the absence of guidance from the Second Circuit. *See Walker v. City of New York*, 63 F. Supp. 3d 301, 310 n.9 (E.D.N.Y. 2014) ("This Court holds that absent any contrary directive from the Second Circuit, all five *Colon* factors survive the Supreme Court's decision in [*Iqbal*].""), *aff'd*, 621 F. App'x 74.

notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983)).

For purposes of establishing deliberate indifference, "[t]he operative inquiry is whether the facts suggest that the [supervisor's] inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.*, 361 F.3d at 128; *see id.* (noting that "proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference" (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995))). As to gross, rather than mere, negligence, that standard "is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir. 2001)). To establish liability, a plaintiff must also show "that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Id.* at 116 (citation omitted).

Here, McLennon's supervisory liability claims fail for the same reasons that his municipal liability claims fail. Specifically, McLennon cannot demonstrate that the Supervisory Defendants had the knowledge required for supervisory liability or that they failed to act prior to McLennon's stop and arrest. Even if the Supervisory Defendants later learned of the unconstitutional stops and failed to act, McLennon's injury would not be attributable to that conduct because, as currently pleaded, McLennon's unlawful stop occurred before the Supervisory Defendants had knowledge of the unlawful stops. (Am. Compl. ¶ 28.)

As to Augustine's and Price's claims, the Court finds that they have alleged that the

Supervisory Defendants were personally involved in the unlawful stop and arrest in each case. Augustine and Price do not allege the Supervisory Defendants' direct participation in their stops. Rather, they allege the Supervisory Defendants failed to act despite having notice of their subordinates' unconstitutional conduct and having responsibility for the relevant law enforcement areas implicated by the unconstitutional conduct. The Amended Complaint plausibly alleges the Supervisory Defendants' failures in this regard. On five occasions before Augustine and Price were unlawfully stopped, Queens Criminal Court Judges had suppressed evidence arising from Step-Out Enforcement Checkpoints that were deemed unconstitutional. (*Id.* ¶¶ 91–92.) As of August 16, 2012, three of those cases had been decided, and two of those cases were served on the NYPD and Highway Unit 3. (*Id.* ¶ 93.) Two additional cases were decided before Augustine's and Price's unlawful stops. (*Id.* ¶¶ 91–92.)

Defendants do not argue that these allegations do not plausibly plead the Supervisory Defendants' notice of the unconstitutional conduct. As alleged in the Amended Complaint, the Supervisory Defendants had responsibility for overseeing the law enforcement areas related to the checkpoints. Plaintiffs allege that Chan and Tuller were responsible for enforcing the "traffic laws, traffic management, and highway safety." (*Id.* ¶¶ 38–39.) In addition, Ciorra, as the person in charge of the NYPD Highway Patrol, a "specialized unit" within the NYPD, was responsible for, among other things, vehicle checkpoint enforcement. (*Id.* ¶ 40.) Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, Augustine and Price have plausibly alleged that the Supervisory Defendants were aware of the alleged unconstitutional checkpoints used by Highway Patrol Unit 3 at the time they were stopped.

While notice of unconstitutional conduct is not alone sufficient to establish the

Supervisory Defendants' personal involvement, Augustine and Price have alleged more than mere awareness. They allege that despite receiving notice, the Supervisory Defendants "have taken no action and made no effort to stop this unlawful practice." (*Id.* ¶ 164.) The timeline alleged in the Amended Complaint supports this allegation of inaction. Even assuming the Supervisory Defendants only received notice after the service of the Queens Criminal Court Decisions, the Step-Out Enforcement Checkpoints were deployed four additional times, including when Augustine and Price were stopped, with two of those checkpoints also being deemed unlawful by Queens Criminal Court judges. (*Id.* ¶¶ 5, 93, 95.) From the timing of this repeated conduct, there is a plausible inference that, despite having notice of the Step-Out Enforcement Checkpoints' unconstitutionality, and having authority over the relevant enforcement area, the Supervisory Defendants took no action, allowing the conduct to continue and causing Augustine's and Price's stops.

At this stage, because "Plaintiffs need not *prove* their allegations; they must *plausibly plead* them," *Turkmen*, 789 F.3d at 240, these allegations plausibly support an inference that the Supervisory Defendants failed to adequately supervise, or were deliberately indifferent to the actions of, the officers in Highway Patrol Unit 3, *see Wood v. Town of E. Hampton*, No. 08-CV-4197, 2014 WL 49971, at *8 (E.D.N.Y. Jan. 7, 2014) (finding evidence of supervisor's failure to supervise subordinates who committed wrongful acts, despite becoming aware of those acts "was at the very least grossly negligent, if not evidence of personal participation in the alleged violation"); *JG & PG ex rel. JGIII v. Card*, No. 08-CV-5668, 2009 WL 2986640, at *8 (S.D.N.Y. Sept. 17, 2009) (finding allegations that supervisors were twice informed about abuse, yet took no action to halt the alleged abuse, pleaded "sufficient personal involvement . . . to survive [a] motion to dismiss"); *Duamutef v. Leonardo*, No. 91-CV-1100, 1993 WL 428509, at

46

*10 (N.D.N.Y. Oct. 22, 1993) ("[The supervisor] was apprised of obviously unreasonable searches that violated both the constitution and DOCS policy, yet he did nothing. Given the fact that the plaintiff had been unreasonably searched not once, but twice, [the supervisor's] failure to respond to his complaints is akin to 'gross negligence' or 'deliberate indifference.'"), *report and recommendation adopted*, No. 91-CV-1100, 1994 WL 86700 (N.D.N.Y. Mar. 7, 1994); *see also Eldridge v. Williams*, No. 10-CV-0423, 2013 WL 4005499, at *6 (S.D.N.Y. July 30, 2013) (finding sufficient evidence of personal involvement where supervisory defendant with authority to remedy the potential constitutional harm responded to the plaintiff's complaints but failed to take any action to avoid the constitutional harm).

### h. Standing to seek injunctive relief

Defendants move to dismiss Plaintiffs claims for equitable relief. Defendants argue that Plaintiffs lack standing to seek such relief, because they fail to allege an injury-in-fact. (Defs. Mem. 23–24.) Defendants also argue that, while Plaintiffs allege past injury, they do not plausibly allege that they would be subject to the same Step-Out Enforcement Checkpoints in the future. (*Id.* at 24.)

When seeking injunctive relief, "a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "[T]o meet the constitutional minimum of standing" for such relief, a plaintiff "must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102 (1983)). The alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Knife*

*Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. ---, ---, 134 S. Ct. 2334, 2341 (2014)); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has 'repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.'" (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. ---, --- 133 S. Ct. 1138, 1147 (2013))). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

As the Second Circuit has noted, in the context of section 1983 claims, the Supreme Court's decision in "*City of Los Angeles v. Lyons* occupies much of this territory." *Shain*, 356 F.3d at 215. In *Lyons*, the Supreme Court found a plaintiff, who had been subjected to, and injured by, a police chokehold during a traffic stop, lacked standing to seek injunctive relief precluding officers from using chokeholds. *Lyons*, 461 U.S. at 104–07. According to the Supreme Court, although the plaintiff's prior injury from a choke hold served as a predicate for seeking compensatory damages from the officers, the plaintiff lacked standing for prospective equitable relief because the past conduct alone failed to show that there was "likelihood that [the plaintiff] will again be wronged in a similar way." *Id.* at 111. The Second Circuit reached a similar result in *Shain v. Ellison*, where the plaintiff had been arrested and subjected to an unconstitutional strip search. *Shain*, 356 F.3d at 213, 215. The Second Circuit found that the plaintiff lacked standing to seek injunctive relief because he failed to establish "the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search." *Id.* at 215. According to the Second Circuit, it was "entirely conjectural" to assert

that the plaintiff would be arrested and detained in the same manner so as to give rise to the similar unconstitutional harm. *Id.*

In line with these decisions, when making the requisite showing for purposes of standing, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future." *Id.* at 215; *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) ("To establish standing for an injunction, a plaintiff must not merely allege past injury, but also a risk of future harm."). In some cases, this showing of likelihood of future harm may be satisfied where a plaintiff has been subject to the same unconstitutional conduct on multiple occasions. *See Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013) ("The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented."); *Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("[T]he fact that several Plaintiffs in this case have received multiple summonses alleged to have been issued without probable cause suggests the potential for future harm to rise above the speculative level."); *Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 827 (S.D.N.Y. 2011) (finding the allegations moved from speculative to likely as the complaint stated that officers "explicitly threatened to return to two of the eight homes in which they conducted operations" and that "in another case, agents actually *did* return to the home, visiting twice in thirteen months").

Here, Plaintiffs seek to "enjoin[] the NYPD from continuing its policy, practice and/or custom of unlawful suspicionless checkpoint stops" and "requiring the City and NYPD Commissioner to institute and implement improved policies and programs with respect to training, supervision, and discipline designed to eliminate the NYPD's policy, practice and/or custom of unlawful suspicionless checkpoint stops." (Am. Compl. 36.) Although Plaintiffs seek

this prospective relief, the Amended Complaint contains few allegations demonstrating their standing for such relief. In support of their allegation that they "risk being stopped in the future," Plaintiffs rely primarily on their intent to travel on New York City roadways. (*See id.* ¶ 51.) Both McLennon and Price are residents of New York City and allege that they "continue to regularly travel on the streets, highways, thoroughfares, and/or service ramps in the City of New York where the NYPD conducts its suspicionless checkpoint stops." (*Id.*) Augustine is a resident of Ohio, but alleges that he is nevertheless "susceptible, upon every visit to New York City, of being stopped in the same patently impermissible way." (*Id.*) More generally, Plaintiffs highlight that because Defendants are acting "without any reasonable articulable suspicion of criminality, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD." (*Id.* ¶ 172.)

While Plaintiffs have sufficiently alleged a past injury based on the unlawful stops, their allegations fail to allege a sufficient likelihood of a future concrete injury. Aspects of Plaintiffs' allegations support standing, as "the risk of injury is not based on a string of unlikely contingencies." *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012). The Amended Complaint alleges that Plaintiffs were unlawfully stopped, as in *Floyd*, "while going about [their] daily life," specifically, driving on the roadway. *Id.* While this fact removes many of the contingencies found troubling to the Supreme Court in *Lyons* or the Second Circuit in *Shain* — Plaintiffs need not be arrested, in a particular location or act in a particular manner to recreate the circumstances of their first unlawful suspicionless stop — the likelihood of future harm remains too speculative. Although Plaintiffs may continue to drive on New York City roadways, and even the same roadway on which their unlawful stops occurred, that, alone, does not create a substantial likelihood of a real and immediate threat of future harm. *See*

*MacNamara v. City of New York*, 275 F.R.D. 125, 141 (S.D.N.Y. 2011) ("That some Plaintiffs *may* participate in future demonstrations of unspecified date, duration, or scope does not translate into a 'real and immediate threat of future injury.'" (first citing *Shain*, 356 F.3d at 215; and then citing *Lyons*, 461 U.S. at 111)).

These facts distinguish Plaintiffs' claims from those in cases like *Floyd*. Like *Ligon* and *Stinson*, *Floyd* involved an unlawful police practice that was documented as widespread. *Floyd*, 283 F.R.D. at 169. More importantly, in *Floyd*, like *Ligon* and *Stinson*, at least one plaintiff had been subjected to the unlawful police practice multiple times. *Floyd*, 283 F.R.D. at 169 ("[U]nlike Lyons, who alleged only one past instance of unconstitutional police behavior, Ourlicht was stopped by NYPD officers three times in 2008 and once again in 2010."); *see Ligon*, 288 F.R.D. at 81 (describing repeated incidents involving the same plaintiff); *Stinson*, 282 F.R.D. at 382 (noting that several plaintiffs received "multiple summonses" without probable cause). By contrast, as discussed above, Plaintiffs have not plausibly alleged that there was a widespread practice of unlawful Step-Out Enforcement Checkpoints.[11] Moreover, while Plaintiffs have each been unlawfully stopped, each alleges only a single incident to form the basis of their claims for compensatory damages. Plaintiffs attempt to bolster the likelihood of future injury by alleging that "many drivers have been repeatedly stopped at illegal suspicionless checkpoints." (Am. Compl. ¶ 10.) However, this allegation is conclusory and is not supported

---

[11] Notably, while Plaintiffs do ultimately plead municipal liability for the unlawful stop based on a theory of the municipality's failure to respond to the unconstitutional conduct, that does not necessarily create standing for equitable relief. "*Lyons* defines its 'official policy' requirement in a significantly more limited way than the courts have interpreted this same requirement under *Monell*." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 596 (S.D.N.Y. 2011). Although "standing under *Lyons* and municipal liability under *Monell* [both] require an official policy sanctioning the unconstitutional conduct at issue[,] . . . a policy sufficient to hold a municipality liable may be too 'unofficial' to give the plaintiff standing to sue for equitable relief in the first place." *Id.*

by facts about those "many drivers" or their "repeated[] stop[s] at illegal suspicionless checkpoints." (*Id.*) The non-conclusory allegations in the Amended Complaint do not sufficiently plead a likelihood of future harm.

Accordingly, although the Amended Complaint establishes past harm to Plaintiffs and some minimal likelihood of future harm given the repeated instances of unlawful Step-Out Enforcement Checkpoints, those allegations do not rise to the level required to establish standing for injunctive relief.

### III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss the Amended Complaint. The Court dismisses with prejudice (1) Augustine's false arrest and malicious prosecution claims and (2) Price's malicious prosecution claim. The Court dismisses without prejudice (1) all claims against Defendant Loukopoulos, (2) McLennon's malicious prosecution claim, (3) McLennon's claims against the Municipal Defendants and the Supervisory Defendants, and (4) Plaintiffs' claims for injunctive relief. The Court denies Defendants' motion as to (1) Plaintiffs' unlawful stop claims, (2) McLennon's and Price's false arrest claims and (3) Augustine's and Price's claims against the Municipal Defendants and the Supervisory Defendants.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: March 18, 2016
     Brooklyn, New York