UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

WINSTON MCLENNON, KARLICK PRICE, STEPHEN AUGUSTINE, and MAXIMO PEREZ, individually and on behalf of a class of all others similarly situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, a municipal entity; NEW YORK CITY POLICE COMMISSIONER JAMES P. O'NEILL, in his official capacity; FORMER NEW YORK CITY POLICE COMMISSIONER WILLIAM J. BRATTON, in his individual capacity; NEW YORK CITY POLICE TRANSPORTATION BUREAU CHIEF THOMAS CHAN, in his individual and official capacities; FORMER NEW YORK CITY POLICE TRANSPORTATION BUREAU CHIEF JAMES TULLER, in his individual capacity; NEW YORK CITY POLICE HIGHWAY PATROL COMMANDER STEVEN D'ULISSE, in his individual and official capacities, FORMER NEW YORK CITY POLICE HIGHWAY PATROL COMMANDER PAUL CIORRA, in his individual capacity; NEW YORK CITY POLICE HIGHWAY PATROL INSPECTOR SYLVESTER GE, in his individual and official capacities; NEW YORK CITY POLICE HIGHWAY PATROL CAPTAIN TIMOTHY MORGAN, in his individual and official capacities; NEW YORK CITY POLICE HIGHWAY PATROL CAPTAIN JOHN SANFORD, in his individual and official capacities; NEW YORK CITY POLICE HIGHWAY PATROL LIEUTENANT JONATHAN LIPKE, in his individual and official capacities; NEW YORK CITY POLICE HIGHWAY PATROL LIEUTENANT MARC LEVINE, in his individual and official capacities; NEW YORK CITY POLICE HIGHWAY PATROL SERGEANT ADRIAN SANTIAGO, in his individual and official capacities; HIGHWAY PATROL UNIT 3 OFFICER KEITH PENNEY (Shield No. 16421), in his individual capacity; HIGHWAY PATROL UNIT 3 OFFICER NICHOLAS KONKOWSKI (Shield No.8961), in his individual capacity; HIGHWAY PATROL UNIT #3 OFFICER JORDAN BISTANY (Shield No. 22702), in his individual capacity; and HIGHWAY PATROL UNIT #3 OFFICER GEORGE LUTI (Shield No. 26504), in his individual capacity,

Defendants.

-------------------------------------------------------------------- X

**SECOND AMENDED CLASS ACTION COMPLAINT**

**14-cv-06320-MKB-RER**

**<u>DEMAND FOR JURY TRIAL</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................- 4 -

JURISDICTION ...................................................................................................- 10 -

VENUE ........................................................................................................- 10 -

JURY DEMAND ..................................................................................................- 10 -

PARTIES ......................................................................................................- 11 -

    As to Class Members ...................................................................................- 11 -

    As to the Named Plaintiffs ...........................................................................- 12 -

    Defendants .............................................................................................- 14 -

STATEMENT OF FACTS .......................................................................................- 19 -

    Required Checkpoint Procedures.....................................................................- 19 -

    Unconstitutional and Discriminatory NYPD Checkpoints................................- 21 -

    Location of the Unconstitutional Checkpoints in Neighborhoods of Color ...................- 22 -

    The Racial Hostility Within The Highway Patrol Unit ...................................- 23 -

    Racially Disparate Effect of Quotas ...............................................................- 25 -

    The Experiences of All Class Members .........................................................- 27 -

    The Experience of Named Plaintiff Winston McLennon ...............................- 30 -

    Actual Notice to Defendants of their Illegal Practice .....................................- 33 -

    The Experience of Plaintiff Maximo Perez ....................................................- 33 -

    The Experience of Plaintiff Karlick Price........................................................- 36 -

    The Experience of Plaintiff Stephen Augustine .............................................- 38 -

    Unconstitutional and Discriminatory Checkpoint Stops are a Direct and Proximate Result of Defendants' Policies, Practices, and/or Customs ...............................- 41 -

    Failure to Properly Screen, Train and Supervise NYPD Highway Patrol Officers ...................................................................................- 41 -

    Failure to Monitor and Discipline NYPD Highway Patrol Officers ...............- 42 -

Encouraging, Sanctioning and Failing to Rectify Discriminatory and
Unconstitutional Checkpoint Stops ................................................................- 43 -

The Pattern and Practice of Unlawful Checkpoint Stops .................................- 44 -

CLASS ACTION ALLEGATIONS ..............................................................................- 45 -

*The Injunctive Class*.........................................................................................- 45 -

*The Damages Class* .........................................................................................- 49 -

FIRST CAUSE OF ACTION .......................................................................................- 53 -

(Claims by Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983 and
Article 1, § 12 of the New York State Constitution Against All Defendants for
Violations of Their Rights to be Free from Unlawful Searches and Seizures)................- 53 -

SECOND CAUSE OF ACTION .................................................................................- 56 -

(Named Plaintiffs' Claims Pursuant to 42 U.S.C. § 1983 Against Officers Penney,
Konkowski, Bistany, and Luti) ........................................................................- 56 -

THIRD CAUSE OF ACTION .....................................................................................- 57 -

(Claims of Named Plaintiffs and Class Members Against Defendants for Violations
of Their Equal Protection Rights Under Article 1, § 11 of the New York State
Constitution and under the Fourteenth Amendment and 42 U.S.C. § 1981 Pursuant to
42 U.S.C. § 1983) ............................................................................................- 57 -

FOURTH CAUSE OF ACTION .................................................................................- 58 -

(Claims of Plaintiffs and Class of Violation of Title VI of the Civil Rights Act of
1964)        ........................................................................................................- 58 -

REQUESTS FOR RELIEF ..........................................................................................- 59 -

## PRELIMINARY STATEMENT

1.      Plaintiffs Winston McLennon, Karlick Price, Stephen Augustine, and Maximo Perez, individually and on behalf of a class of similarly situated individuals, bring this civil rights action to secure relief for Defendants' misuse of a police practice known as "stand out" or "step out" or "conditions" enforcement to avoid the requirements of establishing legitimate and constitutionally compliant vehicle checkpoints.

2.      Through this unlawful practice, Defendants have illegally stopped and detained countless drivers and their passengers in New York City, specifically targeting neighborhoods and individuals of color, and have maliciously prosecuted more than one hundred of those drivers, in violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

3.      The Defendants in this action, the City of New York ("the City"), New York City Police Commissioner James P. O'Neill ("Commissioner O'Neill"), Former New York City Police Commissioner William J. Bratton ("Former Commissioner Bratton"), New York City Police Transportation Bureau Chief Thomas Chan ("Chief Chan"), Former New York City Police Transportation Bureau Chief James Tuller ("Former Chief Tuller"), New York City Police Highway Patrol Commander Steven D'Ulisse ("Commander D'Ulisse), Former New York City Police Highway Patrol Commander Paul Ciorra ("Former Commander Ciorra"), New York City Police Highway Patrol Inspector Sylvester Ge ("Inspector Ge"), New York City Police Highway Patrol Captain Timothy Morgan ("Captain Morgan"), New York City Police Highway Patrol

Captain John Sanford ("Captain Sanford"), New York City Police Highway Patrol Lieutenant Jonathan Lipke ("Lieutenant Lipke"), New York City Police Highway Patrol Lieutenant Marc Levine ("Lieutenant Levine"), New York City Police Highway Patrol Sergeant Adrian Santiago ("Sergeant Santiago"), Highway Patrol Unit 3 Officer Keith Penney (Shield No. 16421) ("Officer Penney"), Highway Patrol Unit 3 Officer Nicholas Konkowski (Shield No.8961) ("Officer Konkowski"), Highway Patrol Unit 3 Officer Jordan Bistany (Shield No. 22702) ("Officer Bistany"), and Highway Patrol Unit 3 Office George Luti (Shield No. 26504) ("Officer Luti"), have implemented and are continuing to enforce, encourage, and sanction a policy, practice, and/or custom of New York City Police Department Highway Patrol officers of stopping motorists in the City of New York, including Plaintiffs and others similarly situated, at unregulated checkpoints that do not comport with the Fourth and Fourteenth Amendments.  These checkpoints were and are arbitrary, discretionary, unlawful, and unconstitutional.

4.      In addition, this pattern, practice, and/or custom of operating unregulated checkpoints involves unconstitutionally stopping, seizing, questioning, and searching drivers in their vehicles without any legal basis and wrongfully detaining, falsely arresting, and maliciously prosecuting them through the use of fabricated charges and/or testimony.

5.      Defendants' conduct these arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops in primarily poor neighborhoods of color, resulting in a disproportionate number of unconstitutional stops, detentions, arrests, and prosecutions of minorities.

6.      At these *de facto* checkpoints, Defendants also selectively and arbitrarily target individuals of color for extended searches, false arrests, and malicious prosecutions.

7.      Unconstitutional and discriminatory checkpoint stops, and the resulting illegal seizures, searches, arrests, and prosecutions have flourished as a result of, and are directly and

proximately caused by, policies, practices and/or customs devised, implemented and enforced by the Defendants, who have acted with deliberate indifference to the constitutional rights of drivers by:

(a)     failing to properly screen, train, and supervise Highway Patrol officers with respect to establishing and conducting legally permissible and constitutionally compliant checkpoints;

(b)     failing to adequately monitor and supervise the activities of Highway Patrol officers to prevent unconstitutional and discriminatory *de facto* checkpoint stops, seizures, and search practices from taking place;

(c)     failing to sufficiently discipline Highway Patrol officers who engage in constitutional abuses, including, but not limited to such conduct as unlawful stops, racial and/or ethnic profiling, preparation of false accusatory instruments, fabrication of evidence and testimony; and

(d)     encouraging and/or failing to punish or rectify these unconstitutional practices through, among other methods, establishing quotas requiring officers to achieve a specified number of summonses and arrests within a designated period of time.

8.     The persistent pattern, policy, practice, and/or custom of conducting these unconstitutional checkpoints has been widely known and reported.

9.     In a series of reported judicial decisions beginning in June 2012, New York criminal court judges have found that these unregulated checkpoint stops violate clearly-established federal constitutional rights and New York law.  *See People v. Nandlall*, Docket No. 2011QN029355 (N.Y. Criminal Court Queens Cnty. June 14, 2012) (Michael J. Yavinsky, J.); *People v. Rakitzis*, Docket No. 2012QN000287 (N.Y. Criminal Court Queens Cnty. June 27, 2012)

(Michael J. Yavinsky, J.); *People v. McLennon*, Docket No. 2011QN058200 (N.Y. Criminal Court Queens Cnty. July 31, 2012) (Stephanie Zaro, J.); *People v. Perez*, Docket No. 2011QN056990 (N.Y. Criminal Court Queens Cnty. Feb. 13, 2013) (Mary O'Donoghue, J.); *People v. Garcia*, Docket No. 2011QN043391 (N.Y. Criminal Court Queens Cnty. Mar. 12, 2014) (David M. Hawkins, J.).

10. In each of these cases, the Court found that Highway Patrol officers had conducted an arbitrary, discretionary, unlawful, and unconstitutional stop that constituted a Fourth Amendment seizure and that the stop was the result of an unregulated and legally impermissible checkpoint.

11. In each of these cases, the Court also found incredible the testimony of defendant Highway Patrol officers regarding their purported justification for the stop.

12. In each of these cases, the Court found that any evidence supporting criminal charges was unconstitutionally obtained, and must be suppressed.

13. In each of these cases, the criminal charges were dismissed.

14. These judicial decisions were personally served on the New York City Police Department ("NYPD") headquarters at One Police Plaza and the NYPD Highway Patrol Unit 3 on August 16, 2012.

15. Nonetheless, despite actual notice of judicial decisions admonishing Highway Patrol officers for conducting arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops and despite the fact that these decisions reveal a pattern of dishonest officer testimony and concocted evidence meant to justify otherwise wrongful stops, the unlawful policy, practice, and/or custom of unconstitutional checkpoint stops continues.

16.     The Legal Aid Society alone represented eighteen defendants who were arrested and prosecuted as a result of unconstitutional checkpoint stops *prior to* service of the judicial decisions on August 16, 2012, informing the NYPD and Highway Patrol Unit 3 of the unconstitutionality of this policy, practice, and/or custom of utilizing unregulated and illegal checkpoints.

17.     More than three hundred prosecutions have been docketed in Queens County Criminal Court since the practice of arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops was detected in 2011.

18.     Defendants did not stop this unlawful and unconstitutional policy, pattern, and procedure despite actual notice it was unlawful and unconstitutional.

19.     In fact, from August 17, 2012 through December 31, 2016, in Highway Patrol Unit 3 alone, approximately 195 individuals were arrested and prosecuted as a result of these unconstitutional checkpoint stops *after* service of the judicial opinions that stated these stops were unlawful and unconstitutional.

20.     Furthermore, supervising officials have ratified the unlawful policy, practice, and/or custom by rewarding the Highway Patrol Officers conducting such arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops with official commendations, endorsed and encouraged public praise and/or other recognition because of their participation in the unlawful checkpoints stops.

21.     As a direct and proximate result of this policy, practice, and/or custom, countless drivers have been, and more continue to be, subjected to arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops by Highway Patrol officers.

22.     Indeed, drivers whose travel needs require recurring driving on the roads used for the arbitrary, discretionary, unlawful, and unconstitutional checkpoints have been repeatedly stopped.

23.     These constitutional abuses have been attended by unlawful searches and seizures, false arrests, and malicious prosecutions.

24.     Following the entry of judicial decisions finding the practice unconstitutional, the Queens County District Attorney's Office ("DA's Office") began offering nearly all individuals subsequently arrested by the Highway Patrol Unit 3 at an illegal checkpoint adjournments in contemplation of dismissal.

25.     Despite judicial determinations that these unregulated, *de facto* checkpoints are unconstitutional, neither the NYPD nor the Highway Patrol Unit has taken any action to halt the practice of stopping, searching, arresting, and prosecuting individuals arrested through the use of "stand out," "step out," or "conditions" enforcement methods that are quite obviously deliberate efforts to avoid the requirements of establishing a legitimate and constitutionally compliant checkpoint.

26.     The named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief (the "Injunctive Class") and a certified class for the purpose of obtaining compensatory and punitive damages (the "Damages Class"), which includes a number of Subclasses, as defined below.

27.     As for the Injunctive Class, the named Plaintiffs seek a class-wide judgment declaring that the policies, practices, and/or customs described herein violate the Fourth and Fourteenth Amendments of the United States Constitution and the New York State Constitution and federal and state laws.

28.     The named Plaintiffs further request a class-wide injunction enjoining defendants from continuing such unlawful policies, practices and/or customs and directing them to implement all necessary measures to ensure against such unlawful policies, practice, and/or customs from being reinstated.

29.     As for the Damages Class, and related Subclasses as defined below, the named Plaintiffs seek compensatory and punitive damages.

30.     As for each Class, the named Plaintiffs seek an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION

31.     Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiffs' federal constitutional and civil rights.

32.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

33.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' claims under state law because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

34.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## JURY DEMAND

35.     Plaintiffs demand a trial by jury in this action on each and every one of their claims that require a factual determination of the merits.

## PARTIES

### As to Class Members

36.     All members of the Injunctive and Damages Classes, including Subclasses, are persons who, at the time of their unlawful stops, were drivers of, or passengers in, vehicles traveling on the streets, highways, thoroughfares and service ramps in the City of New York where the NYPD implements its policy, practice, and/or custom of unlawful checkpoint stops.

37.     Each Class member was arbitrarily stopped by an officer at a checkpoint that failed to comply with constitutionally mandated requirements of the Fourth Amendment.

38.     To justify the arbitrary stop, officers conducting the *de facto* checkpoint, attempted to attribute the stop to a traffic infraction in order to acquire the requisite and articulable level of suspicion needed to detain the occupants of the vehicle.

39.     The detention of the Class members also presented an opportunity to ascertain the race and ethnicity of the occupants of the vehicle.

40.     Members of the Damages Class, including the Subclasses defined below, are those members of the Injunctive Class who, in addition to being unlawfully stopped, were arrested and/or prosecuted as a result of their unlawful stop.

41.     Each Damages Class member was subjected to an illegal seizure, search, arrest, detention, and/or malicious prosecution.

42.     As a result, each Damages Class member suffered loss of liberty; loss of income; embarrassment; humiliation; emotional, mental, and psychological pain and suffering; reputational harm; and/or incurred attorney's fees.

**As to the Named Plaintiffs**

43.     Plaintiff WINSTON MCLENNON ("Mr. McLennon") is a 47-year old African-American male who resides in the City of New York and borough of Brooklyn.

44.     Mr. McLennon travels on the Grand Central Parkway and other streets, highways, thoroughfares, and service ramps where NYPD officers patrol and/or conduct these unlawful checkpoint stops.

45.     On October 28, 2011, Mr. McLennon was unlawfully stopped at an illegal checkpoint on a ramp at the intersection of the Grand Central Parkway and the Long Island Expressway in Queens and was arrested and maliciously prosecuted.

46.     Plaintiff KARLICK PRICE ("Mr. Price") is a 29-year old African-American male who resides in Long Island City, New York.

47.     Mr. Price travels on the Grand Central Parkway and other streets, highways, thoroughfares, and service ramps, where NYPD officers patrol and/or conduct these unlawful checkpoint stops.

48.     On June 13, 2014, Mr. Price was unlawfully stopped, detained, and arrested at an illegal checkpoint in Queens, on the ramp at the same intersection of the Grand Central Parkway and the Long Island Expressway as Plaintiff McLennon had been unlawfully stopped, nearly three years prior.

49.     Plaintiff STEPHEN AUGUSTINE ("Mr. Augustine") is a 48-year old African-American male who currently resides in Westerville, Ohio.

50.     Mr. Augustine's mother and relatives reside in New York City and he frequently returns to visit.  When he does, Mr. Augustine travels on the Grand Central Parkway and other

streets, highways, thoroughfares, and service ramps where NYPD officers patrol and/or conduct these unlawful checkpoint stops.

51.    On November 28, 2014, Mr. Augustine was unlawfully stopped, detained, and arrested at an illegal checkpoint in Queens, on the ramp at the same intersection of the Grand Central Parkway and the Long Island Expressway as Plaintiffs McLennon and Price had been unlawfully stopped.

52.    Plaintiff MAXIMO PEREZ ("Mr. Perez") is a 31-year old Hispanic male who currently resides in Queens, New York.

53.    At all times relevant herein, Mr. Perez resided in the Corona neighborhood of Queens, just blocks away from the intersection of the Grand Central Parkway and Long Island Expressway.

54.    He routinely travels on the Grand Central Parkway and other streets, highways, thoroughfares, and service ramps where NYPD officers patrol and/or conduct these unlawful checkpoint stops.

55.    Because he lived in the area, Mr. Perez was repeatedly stopped after driving eastbound on the Grand Central Parkway, heading onto the Long Island Expressway, a route he routinely traveled to and from his home.

56.    On October 4, 2013, Mr. Perez was arrested on the northeast corner of the Long Island Expressway and Grand Central Parkway.

57.    Both before and after his arrest, Mr. Perez has been repeatedly stopped at illegal checkpoints in Queens heading to his home, on the same ramp at the intersection of the Grand Central Parkway and the Long Island Expressway and in the exact same manner as Plaintiffs McLennon and Price.

58.     Mr. Perez had no other option for exiting the Grand Central Parkway in order to go home.

**Defendants**

59.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created by and authorized under the laws of the State of New York.

60.     The City is authorized to maintain a police department, and does maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

61.     The City assumes the risks incidental to the maintenance of a police force and the employment of police officers, including the operations described herein.

62.     The NYPD currently maintains a Highway Patrol Unit for each borough of New York City, except Manhattan.

63.     Highway Patrol Unit 3 has jurisdiction to patrol the streets, highways, thoroughfares, and exit and entry ramps in the borough of Queens.

64.     Defendant JAMES P. O'NEILL ("Commissioner O'Neill") is the current Police Commissioner of the City of New York and is responsible for creating, supervising, administering, and/or overseeing the policies, practices, and/or customs of the NYPD.

65.     Commissioner O'Neill is responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers under his command who are employed by the NYPD, including the defendants named herein.

66.     Commissioner O'Neill is sued in his official capacity.

67.     Defendant WILLIAM J. BRATTON ("Former Commissioner Bratton") is the Former Police Commissioner of the City of New York and was responsible for creating, supervising, administering, and/or overseeing the policies, practices, and/or customs of the NYPD.

68.     Former Commissioner Bratton, at times relevant herein, was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers under his command who are employed by the NYPD, including the defendants named herein.

69.     Former Commissioner Bratton is sued in his individual capacity.

70.     Defendant THOMAS CHAN ("Chief Chan") is the Chief of the Transportation Bureau for the NYPD, and is currently responsible for supervising, monitoring, and carrying out the policies, practices, and/or customs of the NYPD regarding enforcement of traffic laws, traffic management, and highway safety.

71.     Chief Chan is, at times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the defendant Highway Patrol officers named herein.

72.     Chief Chan is sued in his individual and in his official capacity.

73.     Defendant JAMES TULLER ("Former Chief Tuller") was, at times relevant herein, the Former Chief of the Transportation Bureau for the NYPD, and was, at times relevant herein, responsible for supervising, monitoring, and carrying out the policies, practices, and/or customs of the NYPD regarding enforcement of traffic laws, traffic management, and highway safety.

74.     Former Chief Tuller, at times relevant herein, was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers

under his command who are or were employed by the NYPD, including the defendant Highway Patrol officers named herein.

75.     Former Chief Tuller is sued in his individual capacity.

76.     The NYPD Highway Patrol, currently headed by defendant COMMANDER STEVEN D'ULISSE, ("Commander D'Ulisse") is a specialized unit under the auspices of the NYPD's Transportation Bureau primarily responsible for patrolling, maintaining traffic safety, and enforcing traffic laws on limited-access highways within New York City.

77.     The NYPD Highway Patrol's other duties and roles include, but are not limited to, accident investigations, advanced driver and radar training for NYPD officers, field sobriety testing, and checkpoint enforcement at key bridges and intersections in the City.

78.     Defendant Commander D'Ulisse, is and was, at times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers under his command who are or were employed by the NYPD, including the defendant Highway Patrol officers named herein.

79.     Commander D'Ulisse is sued in his individual and official capacities.

80.     Defendant PAUL CIORRA ("Commander Ciorra") was, at times relevant herein, the Former Commander  of the NYPD Highway Patrol and was, at times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the defendant Highway Patrol officers named herein.

81.     Former Commander Ciorra is sued in his individual capacity.

82.     Defendant SYLVESTER GE ("Inspector Ge") was, at all times relevant herein, the Highway Patrol District Executive Officer.

83.     Inspector Ge is sued in his individual and official capacities.

84.     Defendant TIMOTHY MORGAN ("Captain Morgan") was, at all times relevant herein, a Captain employed by the NYPD and assigned to supervise officers at Highway Patrol and at the District Headquarters of Highway in Queens, New York.

85.     Captain Morgan is sued in his individual and official capacities.

86.     Defendant JOHN SANFORD ("Captain Sanford") was, at all times relevant herein, a Captain employed by the NYPD and assigned to supervise officers at Highway Patrol Unit 3.

87.     Captain Sanford is sued in his individual and official capacities.

88.     Defendant JONATHAN LIPKE ("Lieutenant Lipke") was, at all times relevant herein, a Lieutenant employed by the NYPD and assigned to supervise officers at Highway Patrol Unit 3.

89.     Lieutenant Lipke is sued in his individual and official capacities.

90.     Defendant MARC LEVINE ("Lieutenant Levine") was, at all times relevant herein, a Lieutenant employed by the NYPD and assigned to supervise officers at Highway Patrol Unit 3.

91.     Lieutenant Levine is sued in his individual and official capacities.

92.     Defendant ADRIAN SANTIAGO ("Sergeant Santiago") was, at all times relevant herein, a Sergeant employed by the NYPD and assigned to supervise officers at Highway Patrol Unit 3.

93.     Sergeant Santiago is sued in his individual and official capacities.

94.     Defendants Inspector Ge and Captain Morgan, at times relevant herein, held supervisory positions within the NYPD and were responsible for supervising, monitoring, and carrying out the policies, practices, and/or customs of the NYPD  Highway Patrol Unit regarding enforcement of traffic laws, traffic management, and highway safety, and/or were responsible for

the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under their command who are or were employed by the NYPD.

95.     Defendants Inspector Ge and Captain Morgan, were, at times relevant herein, responsible for supervising the Highway Patrol officers who conducted the unconstitutional checkpoint stops described herein.

96.     Defendants Captain Sanford, Lieutenant Lipke, Lieutenant Levine and Sergeant Santiago, at times relevant herein, held supervisory positions within the NYPD and were responsible for supervising, monitoring, and carrying out the policies, practices, and/or customs of the NYPD Highway Patrol Unit 3 regarding enforcement of traffic laws, traffic management, and highway safety, and/or were responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under their command who are or were employed by the NYPD.

97.     Defendants Captain Sanford, Lieutenant Lipke, Lieutenant Levine and Sergeant Santiago were, at all times relevant herein, responsible for supervising the Highway Patrol officers who conducted the unconstitutional checkpoint stops described herein.

98.     Defendants KEITH PENNEY ("Officer Penney"), NICHOLAS KONKOWSKI ("Officer Konkowski"), JORDAN BISTANY ("Officer Bistany"), and GEORGE LUTI ("Officer Luti") are, and/or were, at all times relevant herein, officers, employees or agents of the NYPD.

99.     They were, at times relevant herein, members of the NYPD Highway Patrol Unit 3 who participated in conducting the unconstitutional checkpoint stops described herein.

100.    Officers Penney, Konkowski, Bistany and Luti are each sued in his individual capacity.

101.    At all times relevant herein, Defendants Commissioner O'Neill, former Commissioner Bratton, Chief Chan, former Chief Tuller, Commander D'Ulisse, former Commander Ciorra, Inspector Ge, Captain Morgan, Captain Sanford, Lieutenant Lipke, Lieutenant Levine, Sergeant Santiago, Officer Penney, Officer Konkowski, Officer Bistany, and Officer Luti have acted or/are continuing to act under the color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City, and/or the NYPD by engaging in the conduct described herein.

102.    At all times relevant herein, said Defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents, and employees of the City and/or the NYPD and incidental to the lawful pursuit of their duties as officers, employees, and agents of the City and/or the NYPD.

103.    At all times relevant herein, said Defendants have violated and/or have continued to violate clearly established constitutional standards under the Fourth and Fourteenth Amendments and the New York State Constitution of which a reasonable officer in their position would have known.

## STATEMENT OF FACTS

### Required Checkpoint Procedures

104.    A police officer's detention of individuals during the stop of an automobile, even for a brief period, constitutes a "seizure" of persons subject to the Fourth Amendment.

105.    The Fourth Amendment imposes a constitutional requirement that the stop must not be "unreasonable."

106. While detention of the occupants of a vehicle is reasonable under the Fourth Amendment if based upon an individualized suspicion of wrongdoing, arbitrary and discriminatory vehicle stops are unreasonable seizures violative of the Fourth Amendment.

107. A checkpoint stop, although unquestionably a seizure within the meaning of the Fourth Amendment, is an exception to the Fourth Amendment's prerequisite of individualized suspicion of wrongdoing.

108. The brief suspicionless stops conducted at highway checkpoints for the purpose of combating drunk driving are constitutional.

109. However, since checkpoint stops are conducted without the reasonable, individualized suspicion otherwise required of vehicle seizures by police, decisions of the United States Supreme Court and the New York State Court of Appeals have required checkpoint stops to be strictly regulated.

110. Establishing a lawful traffic checkpoint requires a balance between the promotion of a significant public purpose, such as reducing the frequency of drunk driving and other serious motor vehicle safety hazards, and the need to protect an individual's right to be free from unreasonable searches and seizures.

111. Among other things, the law has long required checkpoints to be carried out pursuant to a uniform procedure embodying explicit, neutral limitations on the conduct of individual officers that afford little discretion with respect to their operation of the checkpoint.

112. Lawful checkpoints must also maintain adequate precautions for drivers as to safety, lighting and fair warning of the existence of the checkpoint.

113. Accordingly, the NYPD, in its Patrol Guide, promulgated procedures and guidelines describing the purposes of a legitimate checkpoint and the functions to be performed

by all personnel involved in establishing and conducting the checkpoint—from the commanding officer to the supervisor to the officer assigned to the checkpoint—and the records to be maintained on a vehicle checkpoint form, including the number of vehicles stopped.

114.    Upon information and belief, the purpose of Defendants' misuse of "stand out" and/or "step out" and/or "conditions" enforcement at the locations where Plaintiffs were stopped was to avoid having to comply with the checkpoint requirements imposed by the Patrol Guide and to conduct arbitrary and discriminatory stops without regard for the strict federal and state constitutional requirements for lawful checkpoints.

115.    Police officers' exercise of "standardless and unconstrained discretion" in making arbitrary vehicle stops, like those made by Defendants here, are unconstitutional.

<u>**Unconstitutional and Discriminatory NYPD Checkpoints**</u>

116.    The Constitution prohibits selective enforcement of the law based on considerations such as race.

117.    The constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause of the Fourteenth Amendment.

118.    Rather than comply with the constitutional requirements for  lawful checkpoints, the NYPD Highway Patrol Units have created a policy, practice, and/or custom of unlawful checkpoints that they call "stand out" or "step out" or "conditions enforcement."

119.    There are no restrictions or regulations as to when the Highway Patrol officers can conduct such "enforcement."

120.    During a "stand out," "step out," or "conditions" enforcement assignment,  NYPD Highway Patrol officers are either sent by a supervisor or go on their own initiative to a location where traffic violations are anticipated, including, but not limited to, infractions relating to drunk

driving, where the officers conduct arbitrary vehicle stops without any of the safety precautions for drivers required by the Patrol Guide, such as warning signs, cones, and adequate lighting.

121.    Through the use of these discretionary and arbitrary procedures, Highway Patrol Units are able to avoid recordkeeping requirements that would document the number of vehicles stopped.

122.    Through the use of these discretionary and arbitrary procedures, Highway Patrol Units are also able to select the drivers who are to be arrested or to receive summonses by avoiding the Patrol Guide requirement to stop only certain vehicles, *e.g.*, every third or fourth vehicles to pass through the checkpoint.

123.    Defendant City has allowed this unconstitutional policy, practice, and/or custom of discriminatory *de facto* checkpoints using the unwritten practices of "stand out," "step out," or "conditions" enforcement to continue unabated despite notice to the NYPD of this unlawful procedure.

## Location of the Unconstitutional Checkpoints in Neighborhoods of Color

124.    The locations chosen by the Highway Patrol officers for these unlawful checkpoints adjoin neighborhoods of color.

125.    For example, publicly available data reveals that the neighborhood surrounding the intersection of Grand Central Parkway and the Long Island Expressway, where all named Plaintiffs were stopped, is composed primarily of economically disadvantaged and ethnically diverse communities.

126.    These neighborhoods have high percentages of Hispanic, Asian, African American, and immigrant communities.

127.    For example, the neighborhood of North Corona in Queens is approximately 66% Hispanic, 17% Asian, and 4% African American.[1]

128.    The neighborhood of South Corona in Queens is approximately 53% Hispanic, 14% Asian, and 5% African American.[2]

129.    The neighborhoods of North Corona and South Corona are monitored by the NYPD's Highway Patrol Unit 3.

130.    In the case of Highway Patrol Unit 3, between 2011 and 2016, approximately 83% of the unconstitutional checkpoints stops resulted in arrests of individuals of color.

**The Racial Hostility Within The Highway Patrol Unit**

131.    The Highway Patrol Unit is considered an elite unit within the NYPD.

132.    Despite its reputation, the Highway Patrol Unit has historically been a racially hostile environment for minority officers.

133.    Defendant Inspector Ge, Captain Morgan, Captain Sanford, Lieutenant Lipke, Lieutenant Levine, and Sergeant Santiago have created and perpetuated an environment that is not only discriminatory and hostile to minorities within the Unit but also in the creation and execution of a policy, practice, and/or custom that permits racial and ethnic profiling of drivers on the City's roadways.

134.    The officers conducting these illegal and discriminatory checkpoints at issue in this case are primarily Caucasian males who openly express disdain for communities of color.

---

[1] *NYC-Queens Community District 3—Jackson Heights & North Corona PUMA, NY,* Census Reporter, https://censusreporter.org/profiles/79500US3604102-nycqueens-community-district-3jackson-heights--north-corona-puma-ny/ (last visited July 26, 2018).

[2] *NYC-Queens Community District 4--Elmhurst & South Corona PUMA, NY,* https://censusreporter.org/profiles/79500US3604107-nyc-queens-community-district-4-elmhurst-south-corona-puma-ny/ (last visited July 26, 2018).

135.   For example, Defendant Officer Bistany, who was the arresting officer in 10% of unconstitutional stops by the Highway Patrol Unit 3 between 2011 and 2016, has been publicly hostile to minorities.

136.   On his publicly accessible Facebook page, Officer Bistany heralded the individual who drove his car through a crowd of Black Lives Matter protestors in Ferguson, Missouri, referring to him as a "hero."

137.   He also represented repeatedly that he would arbitrarily enforce the law based on race including, but not limited to, that he would enact  a "slow down in arrests" because of Mayor Bill DiBlasio's relationship with "the black mambazo," referring to the Reverand Al Sharpton.

138.   In contrast, it has been publicly disclosed that Officer Konkowski let a drunk police officer he stopped in a "step out inspection" on January 2, 2013 go free although the officer was so intoxicated that he subsequently struck another vehicle and left the scene of the accident.

139.   Supervisors within the Highway Patrol Unit not only sanction these discriminatory actions of Caucasian officers, but partake in the hostility directed specifically at minorities within the Unit.

140.   In 2016, Officer  Dana Harge, one of only a few minority officers accepted into the Highway Patrol Unit, filed a federal civil rights lawsuit alleging employment discrimination against the very supervisors involved in the discriminatory and unconstitutional checkpoint stops at issue in the present case.

141.   Separately, Sergeant Andre Sce also filed a federal civil rights lawsuit alleging employment discrimination in 2016.

142.     Sergeant Sce and Officer Harge detail a racially hostile environment in which, with supervisors' involvement, minority officers are subjected to racial epithets and discriminatory treatment that began as early as 2011.

143.     Sergeant Sce alleged that the "highest ranking members of Highway, . . . including but not limited to Deputy Chief Ciorra, knew of and routinely ignored and implicitly, if not explicitly, encouraged" supervisors within the Highway Patrol Unit "including Captain Morgan, to maintain the bigoted status quo at Highway." *Sce v. City of New York*, No. 16-cv-7577, ¶ 38 (S.D.N.Y.)

144.     Each of these officers describes rampant racism within the Highway Patrol Unit.

145.     In 2017, Sergeant Valentin Khazin, a colleague of Officer Harge, filed a federal lawsuit alleging that supervisors within the Highway Patrol Unit retaliated against him for refusing to partake in the continuing discrimination and retaliation of Officer Harge. *Khazin v. City of New York*, 17-cv-3779 (E.D.N.Y.).

146.     Officer Harge describes racism within the Highway Patrol Unit as "routine," and details a pervasive hostility against the few officers of color who are accepted into the Highway Patrol who, he alleges, are there "to be seen" and are tasked with "implementing discriminatory practices, under the direction of bigoted supervisors." *Harge v. City of New York*, No. 16-cv-5160, ¶ 49 (S.D.N.Y.)

## **Racially Disparate Effect of Quotas**

147.     The Highway Patrol Unit requires officers in Highway Patrol Units 2 and 3 to issue a minimum of 70 summonses per month.  *Harge v. City of New York*, No. 16-cv-5160 (S.D.N.Y.), ¶¶ 75–77, 132; *Khazin v. City of New York*, 17-cv-3779 (E.D.N.Y.), ¶ 21.

148.   Within the Highway Patrol Unit, the creation of quotas for the numbers of summonses issued and arrests made has increased the use of discretionary "conditions enforcement" to replace legitimate checkpoint stops that require compliance with Patrol Guide restrictions and procedures.

149.   A "conditions enforcement" assignment is seen as a quick and easy way of meeting such unlawful quotas.[3]

150.   The NYPD's policy of unconstitutional and illegal use of "step out," "stand out" or "conditions" enforcement,  in lieu of Patrol Guide compliant checkpoints, was routinely used by officers in the Highway Patrol Units to obtain the unreasonable 70 summonses a month.

151.   Assigning officers within Highway Patrol to "step out," "stand out," or "conditions" enforcement in poor neighborhoods of color and enforcing such quotas had a racially disparate effect.

152.   In Highway Patrol Unit 3 alone, approximately 83% of arrests at the location at issue were individuals of color.

153.   The data reveals that these arrests can be conducted based on the subjective beliefs of the officers.

154.   From data relating to the Highway Patrol Unit 3, approximately 33% of these arrests were based on stops that occurred late at night and were based on objects "hanging" from the rearview mirror and "obstructing" the driver's view.

---

[3] *See* Complaint in *Harge v. City of New York*, 16-cv-5160 (S.D.N.Y.) at ¶¶ 88–89: "An officer assigned to conditions focusing on DWI's (sic) is in a better position to make DWI stops and arrests than an officer who has to respond to jobs that are put over the radio. Working a conditions assignment is particularly important to an officer who needs to meet a quota."

### The Experiences of All Class Members

155.     All members of each class were traveling on the streets, highways, thoroughfares, and service ramps in the City of New York when they were stopped as a result of the NYPD's policy, practice, and/or custom of using "step out," "stand out" or "conditions" enforcement to conduct unconstitutional and unregulated checkpoint stops.

156.     Each class member was subjected to an arbitrary and discriminatory vehicle stop and detention by NYPD officers in the absence of legitimate reasonable and articulable suspicion.

157.     The NYPD did not conduct these particular vehicle stops pursuant to any standardized written procedure for checkpoints.

158.     The NYPD did not prepare a vehicle checkpoint form with respect to these stops.

159.     Rather, the practice, policy, and/or custom of the NYPD and Highway Patrol officers and personnel, as exemplified by the conduct of Officers Penney, Konkowski, Bistany, and Luti in their illegal stops of Plaintiffs, was to conduct such stops in the following manner:

a.     stops are generally conducted in the late hours of the night or early hours of the morning;

b.     stops occur on service ramps off of highways and thoroughfares;

c.     no warning signs are placed at the entrance of the service ramps or anywhere on the surrounding highway or thoroughfare indicating that an NYPD-enforced stop is ahead;

d.     the service ramps where stops occur are dark, have one lane and one direction of travel so that when a vehicle approaches and becomes aware a *de facto* checkpoint is taking place ahead, turning around or traveling in reverse is impossible;

e.       marked and unmarked NYPD issued vehicles, including vehicles disguised as taxi cabs, are parked on the curved roadway of the service ramps in such a manner that they protrude into the roadway (1) causing oncoming cars to abruptly reduce speed in order to avoid hitting the vehicle; (2) causing traffic on the service ramps to slow down or at times, come to a permanent stop; and (3) creating a dangerous condition for all oncoming traffic entering the service ramps at normal rates of speed;

f.       no cones, caution tape, or service lights are placed around the NYPD issued vehicles to prevent oncoming vehicles from hitting them;

g.       officers shine a flashlight in the direction of the slowed or stopped vehicles to prompt the drivers to stop and lower their windows;

h.       officers positions themselves so close to the slowed or stopped vehicle that drivers would not feel as if they could drive off and go about their business;

i.       in addition to generalized questions, such as asking for the driver's name and address or asking to view the driver's license, officers ask targeted questions, such as inquiring where the driver is going or if the driver had been drinking, so that such a driver would feel she or he was the target of criminal suspicion;

j.       during such questioning, officers shine a flashlight into the windows of the vehicle, enabling them to see parts of the vehicle that would not be otherwise be visible had it been traveling at a normal rate of speed;

k.       individual officers conducting the stops have complete discretion to stop vehicles as they choose;

l.       no information regarding these stops is recorded in NYPD issued forms, memobooks, digital databases, or written logs;

m.      no specialized paperwork is completed or used in association with these stops; and

n.      there is no supervisory oversight over the enforcement of the checkpoint stops.

160.    In an effort to obscure these unlawful checkpoint stops when prosecuting people arrested at these checkpoints, officers then routinely use a false justification for the stops, such as a window or mirror obstruction or defective light, to fabricate an individualized suspicion for stopping the Plaintiffs' vehicles.

161.    The officers then sign false accusatory instruments incorporating the pretextual basis for the stop and testify untruthfully regarding that fabricated justification.

162.    These arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops fail to comply with any of the safeguards required for vehicle checkpoints, including but not limited to the requirement that "stops be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers" so that the stops are not the result of unconstrained officer discretion, and that stops are recorded in a manner that allows for meaningful "post-stop judicial review." *See People v. Abad*, 98 N.Y.2d 12 (2002); *Matter of Muhammad F. and People v. Boswell*, 94 N.Y.2d 136 (1999); *People v. Scott*, 63 N.Y.2d 518 (1984).

163.    All members of the Injunctive Class have been subjected to unlawful and unreasonable detainment as a result of these arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops.

164.    All members of the Damages Class, in addition to the foregoing, have been subjected to arrest and/or prosecution as a result of these  arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops.

## The Experience of Named Plaintiff Winston McLennon

165.    On October 28, 2011 at approximately 2:55 a.m., Mr. McLennon was driving eastbound on the Grand Central Parkway.

166.    He approached a service ramp to get onto the Long Island Expressway.

167.    There were no signs posted on the Grand Central Parkway or near the entrance of the service ramp warning that the NYPD was conducting a checkpoint stop ahead.

168.    This one-lane service ramp, with only one overhead street light, had a sharp curve in the roadway, surrounded on both sides by trees and foliage, preventing on-coming traffic from being able to see what was happening ahead.

169.    After traveling past the sharp curve, Mr. McLennon was abruptly forced to slow his vehicle upon seeing defendant Officer Penney standing in the middle of the service ramp and a yellow taxi cab, with Officer Konkowski inside, parked in such a manner that it protruded into the roadway.

170.    There were no cones, caution tapes, ropes, signs, or flares around the yellow taxi cab to alert oncoming traffic of its presence.

171.    Officer Penney shined a flashlight at Mr. McLennon's vehicle, obstructing his view.

172.    Since the service ramp had one lane and the road ahead was blocked by Officer Penney and the parked yellow taxi cab, Mr. McLennon was forced to stop.

173.    Officer Penney then asked Mr. McLennon a series of targeted questions, including but not limited to, whether he had been drinking and/or what he had to drink.

174.    During said questioning, Officer Penney shined his flashlight in each of the windows of Mr. McLennon's vehicle attempting to look at the contents inside.

175.    Officer Penney ordered Mr. McLennon to exit the vehicle, searched him, and subjected Mr. McLennon to a portable breathalyzer test.

176.    Officer Penney did not record any of Mr. McLennon's statements in a NYPD issued memobook or on standardized paperwork during this time.

177.    Upon information and belief, a Vehicle Checkpoint Form (PD 371-143), required for lawful checkpoints, was not filled out or provided to the District Attorney's Office or the Court.

178.    Mr. McLennon was arrested and arraigned later that day on violations of the New York State Vehicle and Traffic Law.

179.    Officer Penney signed the criminal court complaint against Mr. McLennon claiming, as a pretext for the stop, that McLennon had violated the Vehicle and Traffic Law by having air fresheners hanging from his rear view mirror.

180.    Over 16 hours later, Mr. McLennon was released on his own recognizance, but was subsequently forced to appear in court numerous times.

181.    On April 3, 2012, New York State Criminal Judge Stephanie Zaro held a pretrial suppression hearing in Mr. McLennon's case.

182.    Officer Penney testified at the hearing that he was not on foot patrol.

183.    Officer Penney testified at the hearing that he was on patrol in an unmarked vehicle performing "stand out enforcement" on a service ramp from the Grand Central Parkway to the Long Island Expressway.

184.    Officer Penney described stand out enforcement to the Court as "when you stand outside of your vehicle and you observe vehicle and traffic law violations that are happening from motor vehicles, such as headlights out, taillights out, things hanging from the rearview mirror, et cetera, et cetera."

- 31 -

185.    Officer Penney testified that he authorizes himself to do stand out enforcement.

186.    Officer Penney testified that there are no written instructions or special paperwork for conducting stand out enforcement.

187.    Officer Penney testified that these activities did not constitute a checkpoint.

188.    Officer Penney falsely testified at the hearing that the basis for stopping Mr. McLennon's vehicle was that he was able to see six air fresheners hanging from Mr. McLennon's rearview mirror from fifty feet away, testimony Judge Zaro found to be "highly incredible."

189.    On July 31, 2012, Judge Zaro issued a decision in *People v. McLennon*, Docket No. 2011QN058200 (Criminal Court of the City of New York, Queens Cnty. July 31, 2012), finding that the NYPD stand out enforcement conducted by Officers Penney and Konkowski constituted a checkpoint stop subject to particularized procedures and guidelines; that said procedures and guidelines were not followed; that the officers' basis for stopping Mr. McLennon was incredible; and that the officers had no legal right to stop Mr. McLennon's vehicle and subsequently arrest him.

190.    Judge Zaro granted defendant's motion and suppressed all evidence against Mr. McLennon.

191.    On November 21, 2012, Mr. McLennon's case was dismissed and sealed.

192.    As a result of Mr. McLennon's unlawful stop, arrest, imprisonment, and malicious prosecution he suffered, among other things, loss of liberty, embarrassment, humiliation, and emotional, mental, and psychological pain and suffering, and lost income.

193.    Mr. McLennon also lost his job as a result of his wrongful arrest and malicious prosecution.

## Actual Notice to Defendants of their Illegal Practice

194.     In addition to Judge Zaro's decision in Mr. McLennon's case, Criminal Court Judges in Queens County issued four other written decisions finding that the practices used by Defendants to stop drivers on the Grand Central Parkway-Long Island Expressway service ramp constituted an unlawful checkpoint in violation of the Fourth Amendment and the laws of New York: *People v. Nandlall*, Docket No. 2011QN029355 (June 14, 2012) (Michael J. Yavinsky, J.); *People v. Rakitzis*, Docket No. 2012QN000287 (June 27, 2012) (Michael J. Yavinsky, J.); *People v. Perez*, Docket No. 2011QN056990 (Feb. 13, 2013) (Mary O'Donoghue, J.); and *People v. Garcia*, Docket No. 2011QN043391 (Mar. 12, 2014) (David M. Hawkins, J.).

195.     In each case, the judge found that the officer's purported explanation for the stop was incredible and suppressed any evidence found as a result of the stop.

196.     On August 16, 2012, Legal Aid Society employees served copies of the decisions in *People v. McLennon* and *People v. Rakitzis* upon the NYPD at One Police Plaza, and the NYPD Highway Unit 3, at 198-15 Grand Central Parkway, Queens.

197.     Nonetheless, Defendants' unlawful policy, practice, and/or custom continued and supervising officials rewarded the Highway Patrol Officers conducting such illegal arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops with official commendations, public praise and/or other recognition.

198.     As a result, countless further unlawful stops were conducted, including the illegal stops of Plaintiffs Karlick Price, Stephen Augustine, and Maximo Perez.

## The Experience of Plaintiff Maximo Perez

199.     During all relevant times of this Complaint, Mr. Perez lived just a few blocks away from the intersection of the Long Island Expressway and Grand Central Parkway.

200.    At all relevant times herein, Mr. Perez would drive on precisely the same intersection approximately 3 to 4 times a week.

201.    On October 4, 2013 at approximately 2:00 a.m., Mr. Perez was driving on the Grand Central Parkway eastbound and was approaching a service ramp to go onto the Long Island Expressway.

202.    Mr. Perez's brother, Felix Lopez, was in the passenger seat.

203.    There were no signs posted on the Grand Central Parkway or near the entrance of the service ramp indicating that the NYPD was conducting a checkpoint stop ahead.

204.    This one-lane service ramp, with only one overhead street light, had a sharp curve in the roadway, surrounded on both sides by trees and foliage, preventing on-coming traffic from being able to see what was happening ahead.

205.    Suddenly, Mr. Perez noticed a marked police vehicle partially on the road and partially on the grass.

206.    Upon seeing the officers, Mr. Perez slowed his vehicle and was forced to come to a complete stop, with multiple vehicles in front of him, when he saw an officer shining his flashlight in the vehicles' windows and signaling by gesture when each car could proceed.

207.    Mr. Perez had been subjected to this *de facto* checkpoint on multiple occasions prior to this incident.

208.    There were no cones, caution tapes, ropes, signs, or flares around the marked NYPD police vehicle to alert oncoming traffic of its presence.

209.    Mr. Perez was forced to exit the vehicle and was asked to take a portable breathalyzer test, which he declined.

210.    Officer Harge signed the criminal court complaint against Mr. Perez that stated he had stopped the vehicle because Mr. Perez had violated the Vehicle and Traffic Law by having "objects" hanging from his rear view mirror.

211.    Mr. Perez appeared in Court three times until, in order to avoid continued prosecution, he agreed to plea to a charge of disorderly conduct to resolve the Vehicle and Traffic Law infractions charged against him without the need to make further court appearances.

212.    As a result of his stop, arrest, and prosecution, Mr. Perez was forced to skip a number of days of work, which had a substantial financial impact on him.

213.    Only a few months later, in or about February 2014, Mr. Perez was again stopped in the same location.

214.    He was forced to come to a full stop as there were approximately 10 to 15 cars in front of him.

215.    The Officer would shine a light into each vehicle.

216.    Officer Harge stopped Mr. Perez and asked him a number of targeted questions including, but not limited to, whether he had been drinking.

217.    Mr. Perez was ultimately waived on and was able to continue driving.

218.    Since then, Mr. Perez has been stopped two additional times in the same location.

219.    Mr. Perez continues to drive on the same exact ramp approximately once or twice a month.

220.    Mr. Perez's arrest and prosecution occurred after the NYPD and Highway Patrol Unit 3 received personal service of the prior judicial determinations that the *de facto* checkpoints being conducted were unconstitutional.

## The Experience of Plaintiff Karlick Price

221.    On June 13, 2014 at approximately 1:45 a.m., Mr. Price was driving eastbound on the Grand Central Parkway.

222.    He approached a service ramp to go onto the Long Island Expressway.

223.    There were no signs posted on the Grand Central Parkway or near the entrance of the service ramp indicating that the NYPD was conducting a checkpoint stop ahead.

224.    This one-lane service ramp, with only one overhead street light, had a sharp curve in the roadway, surrounded on both sides by trees and foliage, preventing on-coming traffic from being able to see what was happening ahead.

225.    After traveling past the sharp curve, Mr. Price was abruptly forced to slow his vehicle and come to a complete stop upon seeing approximately three vehicles ahead of him completely stopped on the service ramp and an unmarked burgundy-colored vehicle, with defendant Highway Patrol Officer John Doe #1 inside, parked in such a way that it protruded into the roadway.

226.    There were no cones, caution tapes, ropes, signs, or flares around the unmarked burgundy-colored vehicle to alert oncoming traffic of its presence.

227.    Mr. Price saw an individual wearing a dark-colored outfit walk into the middle of the service ramp.

228.    As the individual approached closer to Mr. Price's vehicle, Mr. Price recognized the individual as a uniformed police officer.

229.    That police officer, now known to be Officer Bistany, shined a flashlight in the front window of Mr. Price's vehicle.

230.    Officer Bistany asked Mr. Price for his license.

231.    Although Mr. Price provided his license, Officer Bistany told Mr. Price to pull over.

232.    Officer Bistany then asked Mr. Price a series of targeted questions, including but not limited to, whether he had been drinking and/or what he had to drink.

233.    During said questioning, Officer Bistany shined his flashlight in each of the windows of Mr. Price's vehicle attempting to look at the contents inside.

234.    Officer Bistany ordered Mr. Price to exit the vehicle, searched him, and subjected Mr. Price to a portable breathalyzer test to which he blew a .000%.

235.    Officer Bistany did not record any of Mr. Price's statements in a NYPD issued memobook or on standardized paperwork during this time.

236.    Upon information and belief, no Vehicle Checkpoint Form (PD 371-143) was filled out or provided to the District Attorney's Office or the Court.

237.    Mr. Price was taken to the 112th Precinct and, notwithstanding the results of his portable breathalyzer test, was asked to submit to a chemical test.

238.    Mr. Price refused resulting in his license being suspended for two months.

239.    Mr. Price was arrested and arraigned later that day on violations of the New York State Vehicle and Traffic Law.

240.    Officer Bistany signed the criminal court complaint against Mr. Price claiming that Price had violated the Vehicle and Traffic Law by having tinted windows and an air freshener hanging from his rearview mirror.

241.    Mr. Price's vehicle did not have tinted windows and there was no air freshener obstructing his view.

242.    Mr. Price was released on his own recognizance, but was forced to appear in Court numerous times.

243.     Mr. Price's license was reinstated when Officer Bistany failed to appear at the refusal hearing.

244.     On February 2, 2015, Mr. Price accepted an adjournment in contemplation of dismissal with sealing to take place in one month.

245.     On March 2, 2015, his case was dismissed and sealed.

246.     As a result of Mr. Price's unlawful stop, arrest, and imprisonment, he suffered, among other things, loss of liberty, embarrassment, humiliation, and emotional, mental, and psychological pain and suffering.

247.     Mr. Price's arrest and prosecution occurred after the NYPD and Highway Patrol Unit 3 received personal service of the prior judicial determinations that the *de facto* checkpoints being conducted were unconstitutional.

### The Experience of Plaintiff Stephen Augustine

248.     On November 28, 2014 at approximately 11:30 p.m., Mr. Augustine was driving eastbound on the Grand Central Parkway.

249.     Inside the vehicle, in addition to Mr. Augustine, were two passengers--his mother, and his cousin, a Bronx County Criminal Court Officer, Joseph Spiver.

250.     Mr. Augustine approached a service ramp to go onto the Long Island Expressway.

251.     There were no signs posted on the Grand Central Parkway or near the entrance of the service ramp indicating that the NYPD was conducting a checkpoint stop ahead.

252.     This one-lane service ramp, with only one overhead street light, had a sharp curve in the roadway, surrounded on both sides by trees and foliage, preventing on-coming traffic from being able to see what was happening ahead.

253.     Mr. Augustine's vehicle was unable to proceed onto the service ramp but, rather, was forced to come to a complete stop as officers from Highway Patrol Unit 3 were arbitrarily stopping vehicles in a *de facto* checkpoint on the ramp and creating traffic congestion.

254.     There were approximately 10 to 15 vehicles stopped ahead of Mr. Augustine.

255.     The traffic congestion continued from the service ramp onto the Grand Central Highway disrupting the flow of traffic and creating a dangerous condition by causing vehicles to come to a complete stop on the busy and fast-moving thoroughfare.

256.     Vehicles were permitted to slowly proceed through the *de facto* checkpoint but only after a police officer, Officer Luti, had shined a flashlight in the vehicles' windows and signaled by gesture that the cars could proceed.

257.     A marked NYPD police vehicle, with a second unidentified Highway Patrol Officer inside, was parked in such a way that it protruded into the roadway.

258.     There were no cones, caution tapes, ropes, signs, or flares around the marked NYPD police vehicle to alert oncoming traffic of its presence.

259.     As Mr. Augustine slowly proceeded on the service ramp toward Officer Luti, he was again caused to come to a complete stop.

260.     Officer Luti shined his flashlight into the windows of Mr. Augustine's vehicle.

261.     Officer Luti asked Mr. Augustine for his license.

262.     Although Mr. Augustine provided his license, Officer Luti told Mr. Augustine to pull over and get out of the vehicle.

263.     Officer Luti then asked Mr. Augustine a series of targeted questions, including but not limited to, whether he had been drinking and/or what he had to drink.

264.   During said questioning, Officer Luti shined his flashlight in each of the windows of Mr. Augustine's vehicle attempting to look at the contents inside.

265.   Officer Luti ordered Mr. Augustine to exit the vehicle, searched him, and subjected Mr. Augustine to a portable breathalyzer test to which he blew a .000%.

266.   Officer Luti did not accurately record any of Mr. Augustine's statements in an NYPD issued memobook or on standardized paperwork during this time.

267.   Upon information and belief, at no time was a Vehicle Checkpoint Form (PD 371-143) filled out or provided to the District Attorney's Office or the Court.

268.   Mr. Augustine was taken to the 112th Precinct and, notwithstanding the results of his portable breathalyzer test, was again asked to be subjected to a chemical test.  Mr. Augustine again blew a .000%.

269.   Mr. Augustine was arrested and arraigned later that day on violations of the New York State Vehicle and Traffic Law.

270.   Officer Luti signed the criminal court complaint against Mr. Augustine that he was conducting a "safety checkpoint."

271.   That day, Mr. Augustine pled to disorderly conduct to resolve the Vehicle and Traffic Law infractions charged against him without the need to make repeated court appearances.

272.   As a result of Mr. Augustine's unlawful stop, arrest, and imprisonment, he suffered, among other things, loss of liberty, embarrassment, humiliation, and emotional, mental, and psychological pain and suffering.

273.   Mr. Augustine's arrest and prosecution occurred after the NYPD and Highway Patrol Unit 3 received personal service of the prior judicial determinations that the *de facto* checkpoints being conducted were unconstitutional.

**Unconstitutional and Discriminatory Checkpoint Stops are a Direct
and Proximate Result of Defendants' Policies, Practices, and/or Customs**

274.    The pervasive unconstitutional practices of the NYPD are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City and supervisory officials and their confederates whose identities are presently unknown, with the knowledge that such policies, practices, and/or customs would lead to violations of the Fourth and Fourteenth Amendments.

275.    Those policies, practices and/or customs include:

(a) failing to properly screen, train and supervise NYPD Highway Patrol officers,

(b) failing to adequately monitor and discipline NYPD Highway Patrol officers, and

(c) encouraging, sanctioning and failing to rectify the NYPD Highway Patrol's custom and practice of conducting unlawful and discriminatory vehicle stops.

**Failure to Properly Screen, Train and Supervise NYPD Highway Patrol Officers**

276.    Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City, Commissioner O'Neill and Bratton and NYPD Highway Patrol officials Chan, Tuller, D'Ulisse, Ciorra, Ge, Morgan, Sanford, Lipke Levine and Santiago ("the Supervisory Officials") failed to properly screen, train, and supervise officers assigned to Highway Patrol, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

277.    The inadequate screening, training and supervision of the NYPD Highway Patrol is a direct and proximate cause of the rampant unconstitutional and discriminatory stops made by the officers assigned to Highway Patrol.

278.    As a direct and proximate cause of the defendants' failure to screen, train, and supervise NYPD Highway Patrol officers, hundreds of people have been subjected to unlawful stops, fabricated charges and documents, and/or false testimony.

279.    By failing to properly screen, train, and supervise NYPD Highway Patrol officers, the City and the Supervisory Officials have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD Highway Patrol.

## Failure to Monitor and Discipline NYPD Highway Patrol Officers

280.    The NYPD Highway Patrol's widespread abuses are also a direct and proximate result of the failure of the City and the Supervisory Officials to properly and adequately monitor, discipline and take necessary corrective action against officers in Highway Patrol Units who engage in, encourage or conceal unconstitutional and discriminatory practices.

281.    Despite having received personal service of prior judicial decisions vividly detailing the NYPD Highway Patrol's practice of conducting *de facto* checkpoints that were patently illegal and unconstitutional, the Supervisory Officials knowingly, deliberately, and recklessly have failed:

a.      to take any corrective measures to stop the practice, and/or custom of unlawful and discriminatory checkpoint stops in the City of New York;

b.      to take appropriate disciplinary action and corrective measures against NYPD Highway Patrol officers who have engaged in arbitrary, discretionary, unlawful, and unconstitutional checkpoint stops;

c.      to take appropriate corrective and/or disciplinary action with respect to identifying racially discriminatory policies and over-policing communities of color;

- 42 -

d.      to devise and implement appropriate oversight, disciplinary and remedial measures in response to judicial decisions finding substantive and extensive evidence that numerous unconstitutional checkpoint stops were taking place;

e.      to conduct adequate auditing to determine if the stops and arrests conducted by NYPD Highway Patrol officers comply with the NYPD's written policies and procedures and constitutional requirements regarding checkpoint stops; and

f.      to take sufficient corrective and remedial action against NYPD Highway Patrol officers who provide fabricated documents, false testimony, and/or impermissible justifications for unlawful vehicle stops.

282.    The City and the Supervisory Officials have failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD Highway Patrol officers and their immediate supervisors, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations.

283.    By such acts and omissions, the City and the Supervisory Officials have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD Highway Patrol.

### Encouraging, Sanctioning and Failing to Rectify Discriminatory and Unconstitutional Checkpoint Stops

284.    Despite notice and knowledge that the acts and omissions described in this Complaint create a likelihood of Fourth and Fourteenth Amendment violations, the City and the Supervisory Officials also have rewarded and encouraged its NYPD Highway Patrol officers with commendations and public praise rather than taking steps to restrain and rectify the abusive and unconstitutional practices used by those officers, including, but not limited to using quotas to expand the number of persons exposed to unconstitutional vehicle stops.

285.     As a direct and proximate result of the City's and the Supervisory Officials' refusal to address these unlawful policies, practices and/or customs, hundreds of people have been, and will continue to be, subjected to unconstitutional stops, searches and seizures by NYPD Highway Patrol officers though the use of arbitrary vehicle stops exercised at the discretion and whim of Highway Patrol officers and immediate supervisors who have publicly expressed extreme racial hostility.

286.     Through such acts and omissions, the City and the Supervisory Officials have acted recklessly and with deliberate indifference to the constitutional rights of individuals who have or will come into contact with the NYPD Highway Patrol.

### The Pattern and Practice of Unlawful Checkpoint Stops and Resulting Malicious Prosecutions

287.     In Highway Patrol Unit 3 alone, well over three hundred cases stemming from arrests made at unlawful highway checkpoints have been docketed in Queens Criminal Court since this practice began around 2009.

288.     These prosecutions follow a familiar pattern as reflected in the experiences of the named plaintiffs.

289.     However, the prosecutions that have actually been filed in court reflect only a fraction of of the individuals who have been unconstitutionally stopped, detained and/or subject to searches of their person and vehicle at these unlawful checkpoints.

290.     The ongoing practice of unlawful checkpoints has been documented by the Legal Aid Society long after the NYPD and Highway Patrol Unit 3 were personally notified of the obvious illegality of these checkpoints.

291.     The Legal Aid Society has videotaped NYPD Highway Patrol officers carrying out these unlawful checkpoints.

292. Mr. Augustine was arrested two months after that, on November 28, 2014, at the same location and under similar conditions.

293. The same type of unlawful checkpoint stops have been observed as recently as February 2015.

294. In a case tried in Queens Criminal Court in April 2017, the racist Facebook posts of Officer Bistany were the subject of testimony that resulted in a direction that the prosecutors provide copies of those materials to defense counsel in any case involving Officer Bistany as Brady materials.

295. Upon information and belief, despite these documented unconstitutional and discriminatory events, the City and the Supervisory Officials have taken no action and made no effort to stop these unlawful practices.

296. Even in the face of five separate written decisions by Queens Criminal Court judges condemning this illegal practice, the Defendants' unlawful policy, practice, and/or custom continues.

## CLASS ACTION ALLEGATIONS

297. Under Fed. R. Civ. P. 23(b)(2), and (b)(3) Plaintiffs bring all of their claims on behalf of the separate but overlapping classes and subclasses listed below.

### The Injunctive Class

298. Under Fed. R. Civ. P. 23(b)(2), all Named Plaintiffs seek to represent an "Injunctive Class" defined as:

> All individuals who have been or will be stopped, or stopped and searched, at *de facto* NYPD checkpoints that fail to comport with the safeguards required for checkpoints and in the absence of the requisite level of suspicion otherwise required for routine traffic enforcement, in violation of the Fourth Amendment to the United States Constitution

and Article I, Section 12 of the New York State Constitution, and other laws (the "Unlawful Checkpoints").

299.     The Injunctive Class contains a subclass defined as:

All non-white individuals who have been or will be stopped, or stopped and searched, at the Unlawful Checkpoints.

300.     The Injunctive Class and Subclass are both so numerous that joinder of all members is impracticable.

301.     Over 300 Injunctive Class and Subclass members have been identified based on records of stops conducted at Unlawful Checkpoints established over a four-year period by NYPD Highway Patrol Unit 3 in one location alone.

302.     These Injunctive Class members were identified through arrest reports and certificates of disposition generated by stops made at the Unlawful Checkpoints established by Highway Patrol Unit 3 at one specific location.

303.     Of these Injunctive Class members, at least 83% were non-white.

304.     Upon information and belief, including video evidence, numerous other Injunctive Class and Subclass members were stopped, or stopped and searched, at the Unlawful Checkpoints operated by Highway Patrol Unit 3 between 2011 and 2016, but remain unidentified because their stops and searches were not recorded by Highway Patrol Unit 3.

305.     In addition, upon information and belief, including reports of checkpoints made by the public on social media and to public defenders, and based on the testimony of the Defendants' 30(b)(6) witness that NYPD officers engage in largely unregulated, discretionary, and/or arbitrary "conditions enforcement" citywide, numerous additional members were subjected to Unlawful Checkpoints at other locations within Highway Patrol Unit 3 and within other Highway Units and Precincts across the City that have yet to be identified.

306.     All Injunctive Class members share numerous common questions of law and fact, including but not limited to:

> a.   Whether Defendant Officers violated the Injunctive Class and Subclass members' rights to be free of unreasonable searches and seizures under the federal or state constitutions or other laws by subjecting them to the Unlawful Checkpoints;
>
> b.   Whether Defendants' conduct violated the Class and Subclass members' rights under clearly established law;
>
> c.   Whether Defendant Supervisory Officers are liable for the violations of the Class and Subclass members' rights by participating directly in the violations, failing to remedy the wrong after being informed of the violations, creating a policy or custom under which the violations occurred, being grossly negligent in supervising their subordinate officers who committed the wrongful acts, or exhibiting deliberate indifference to the Class and Subclass members' rights by failing to act on information that violations were occurring;
>
> d.   Whether the Municipal Defendants are liable for the violations of the Class and Subclass members' rights because the violations became so habitual and widespread as to constitute a municipal custom, because the NYPD commended officers because of their participation in the Unlawful Checkpoints, because the NYPD failed to properly train NYPD officers and those failures resulted in the violations, because the NYPD failed to supervise or discipline officers thereby exhibiting deliberate indifference to the violations, or because the NYPD discouraged officers from reporting the unlawful nature of violations or retaliated against those who did.

307.     The Injunctive Subclass shares these questions and, in addition, shares other questions of law and fact including, but not limited to, whether Defendants intentionally established the Unlawful Checkpoints in communities of color, and/or at the Unlawful Checkpoints, intentionally targeted individuals of color based on impermissible race-based considerations in violation of the Equal Protection clause of the Fourteenth Amendment of the U.S. Constitution.

308.     All of the named Plaintiffs represent the Injunctive Class and Subclass because their claims are typical of the claims of all Injunctive Class and Subclass members.

309.    Each of the Plaintiffs and all of the Injunctive Class members are asserting claims that their rights to be free of unreasonable searches and seizures under federal and state laws were violated.

310.    In addition, each of the Plaintiffs and all of the Subclass members have claims that their rights to equal protection of the laws were violated.

311.    The Injunctive Class and Subclass members are sufficiently ascertainable.

312.    For classes certified under Fed. R. Civ. P. 23(b)(2), it is not required that all of the individual members can be identified; rather, the class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.

313.    Here, the Injunctive Class description is sufficiently definite: individuals who have been or will be stopped, or stopped and searched, at the Unlawful Checkpoints.

314.    And the Injunctive Subclass description is sufficiently definitely: non-white individuals who have been or will be stopped, or stopped and searched, at the Unlawful Checkpoints.

315.    By subjecting the Injunctive Class and Subclass members to the unlawful conduct and/or or failing to prevent the Class and Subclass members from being subjected to the unlawful conduct, Defendants have acted or failed to act on grounds that apply generally to the Class, so that the requested final injunctive relief is appropriate with respect to the Class and Subclass as a whole under Fed. R. Civ. P. 23(b)(2).

316.    Plaintiffs have standing to seek an injunction on behalf of the Injunctive Class and Subclass as Plaintiffs McLennon, Price, and Perez, along with countless other Injunctive Class and Subclass members, both identified and not yet unidentified, are clearly residents of the City who

have and continue to regularly travel on its streets, highways, thoroughfares, and service ramps where the NYPD conducts its Unlawful Checkpoints, making them susceptible to future violations of their rights.

317.    Specifically, Plaintiff Perez has been subjected to the Unlawful Checkpoints on multiple occasions with one such stop resulting in an arrest.

318.    Plaintiffs and all other class members thus have an actual and imminent risk of future harm that is not conjectural or hypothetical, entitling them and the Injunctive Class and Subclass that they represent to injunctive relief.

***The Damages Class***

319.    Under Fed. R. Civ. P. 23(b)(3), Plaintiffs seek to represent a "Damages Class" defined as:

> All individuals who have been or will be stopped and subjected to searches of their vehicles and/or persons at the Unlawful Checkpoints, and who have been or will be unlawfully given summonses or arrested as a result.

320.    The Damages Class Contains three subclasses defined as:

*Equal Protection Subclass (A)*

> All non-white individuals who have been or will be stopped and subjected to searches of their vehicles and/or persons at the Unlawful Checkpoints, and who have been or will be unlawfully given summonses or arrested as a result.

*The Malicious Prosecution Subclass*

> All individuals who have been or will be stopped and subjected to searches of their vehicles and/or persons at the Unlawful Checkpoints, and who have been or will be unlawfully given summonses or arrested and maliciously prosecuted as a result.

*Equal Protection Subclass (B)*

> All non-white individuals who have been or will be stopped and
> subjected to searches of their vehicles and/or persons at the Unlawful
> Checkpoints, and who have been or will be unlawfully given
> summonses or arrested and maliciously prosecuted as a result.

321. The Damages Class and Subclasses are all so numerous that joinder of all members is impracticable.

322. Over 300 Injunctive members have been identified based on records of stops conducted at Unlawful Checkpoints established over a four-year period by NYPD Highway Patrol Unit 3 in one location alone.

323. Of these, at least 290 individuals, who accepted conditional discharges or had their charges dismissed, have potentially viable claims for unlawful summonses or arrests and are Damages Class Members.

324. Of these 290, at least 228 are non-white individuals who additionally have viable equal protection claims and are Equal Protection Subclass (A) members.

325. Of the 290 individuals, at least 41 who had their charges dismissed have potentially viable claims for malicious prosecution and are Malicious Prosecution Subclass members.

326. Of these 41 individuals, at least 31 are non-white individuals who additionally have equal protection claims and are Equal Protection Subclass (B) members as well.

327. Upon information and belief, including but not limited to individuals described in paragraph 301–309, there are numerous other Damages Class and Subclass members who have been ticketed, arrested, and/or maliciously prosecuted at Unlawful Checkpoints at other locations maintained by Highway Patrol Unit 3 and maintained by other Highway Units and Precincts across the City, who have not yet been identified.

328. All of the Damages Class and Subclass members share all the questions of law and fact as the Injunctive Class members.

329.    Additionally, the Damages Class members share questions of law and fact including, but limited to, whether they were ticketed or arrested unlawfully; the Malicious Prosecution Subclass members share additional questions of law and fact including, but not limited to, whether they were prosecuted unlawfully; and the Equal Protection Subclass members share additional questions of law and fact including, but not limited to, whether they were subjected to any and all of such conduct based on impermissible race-based considerations.

330.    Plaintiffs McLennon, Perez, and Price represent the Damages Class because they have viable claims that they were unlawfully ticketed or arrested as a result of the Unlawful Checkpoints and those claims are typical of the claims of all of the Damages Class members.

331.    Plaintiffs McLennon, Perez, and Price represent the Equal Protection Subclass (A) because they have viable claims that they were subjected to that unlawful conduct based on impermissible race-based considerations that are typical of the claims of all of the members of the Equal Protection Subclass (A).

332.    Plaintiff McLennon represents the Malicious Prosecution and Equal Protection (B) subclasses because he has viable claims that he was unlawfully prosecuted as a result of the Unlawful Checkpoints that are typical of the of the claims of all of the Malicious Prosecution Subclass members, and claims that he was subjected to this unlawful conduct based on impermissible race-based considerations that are typical of all of the members of Equal Protection Subclass (B).

333.    The Plaintiffs and their counsel will fairly and adequately represent the interests of all Classes and Subclasses.

334.    The named Plaintiffs have strong personal interest in the outcome of this action.

335.    As long as NYPD officers operate Unlawful Checkpoints, the named Plaintiffs remain at a high risk of being illegally stopped, or stopped and having their vehicles and/or persons searched again.

336.    Indeed, Plaintiff Perez has already been subjected to the Unlawful Checkpoints on numerous occasions.

337.    The named Plaintiffs have tenaciously pursued their claims and have demonstrated a sophisticated understanding of their individual claims and in the significance of being class representatives.

338.    Plaintiffs are collectively represented by the law officers of Fisher & Byrialsen PLLC, Beldock Levine & Hoffman LLP, and the Special Litigation Unit of the Legal Aid Society.

339.    Counsels collectively have the resources, expertise, and experience necessary to prosecute this action.

340.    Counsels have litigated a wide-range of class action lawsuits, including class action lawsuits over unlawful searches and seizures, race-based policing, ticketing, arrests, and malicious prosecutions.

341.    The Damages Class and Subclass members are sufficiently ascertainable.

342.    In class discovery, Defendants were able to readily identify all individuals who had been ticketed or arrested at the Unlawful Checkpoints operated by one Highway Unit in one location over a four-year period by producing their summons and arrest records.

343.    Examination of those records for final dispositions revealed who among those individuals have viable claims that subsequent summonses, arrests, and/or prosecutions were unlawful, and were able to ascertain who among those individuals are non-white.

344.    Defendants should be able to produce similar records for other Unlawful Checkpoints that are identified across the City.

345.    The Damages Class and Subclasses share all of the common questions of law and fact described above.

346.    These questions of law and fact common to the Damages Class and Subclasses predominate over any questions affecting individual members, so that a class action pursuant to Fed. R. Civ. P. 23(b)(3) is superior to all other methods available for fairly and efficiently adjudicating the controversy even if there is a need for separate determinations of damages.

## FIRST CAUSE OF ACTION

### (Claims by Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983 and Article 1, § 12 of the New York State Constitution Against All Defendants for Violations of Their Rights to be Free from Unlawful Searches and Seizures)

347.    Plaintiffs repeat and reiterate the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

348.    The Defendants have implemented, enforced, encouraged and sanctioned a policy, practice, and/or custom of stopping the members of each class at unconstitutional and discriminatory *de* facto checkpoints in violation of Plaintiffs and class members' rights to be free from unlawful searches and seizures.

349.    As a result of this policy, practice, and/or custom, the Defendants have unlawfully stopped and searched, and will continue to unlawfully stop and search, members of the Injunctive Class.

350.    As a result of these stops and searches, the Defendants have falsely arrested and maliciously prosecuted members of the Damages Class.

351.    The constitutional abuses and violations inflicted by the NYPD Highway Patrol were, and are, directly, and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the City and the Supervising Officials include:

(a) the failure to adequately and properly screen, train, and supervise NYPD Highway Patrol officers;

(b) the failure to properly and adequately monitor and discipline NYPD Highway Patrol officers; and

(c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD Highway Patrol's arbitrary, discretionary, unlawful, and unconstitutional stops.

352.    Each of the Defendants has acted with deliberate indifference to the Fourth and Fourteenth Amendment rights of the named Plaintiffs and other members of the class.  As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourth Amendment rights of the named Plaintiffs and other class members have been violated.

353.    By acting under color of state law to deprive the named Plaintiffs and other class members of their rights to be free from unlawful search and seizure, the Defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

354.    As exemplified by Mr. Perez's experience, the NYPD Highway Patrol conducts illegal stops in areas where class members travel—to places where class members reside, work, or visit---creating a real and immediate threat that the Fourth and Fourteenth Amendment rights of the named Plaintiffs and other class members will be violated by NYPD officers in the future.

355.    Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to unlawful arbitrary and discretionary checkpoint stops, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD Highway Patrol.

356.    Only an injunction is certain to end Defendants' unlawful practice.

357.    Defendants have persisted in carrying out this illegal practice even after being personally notified of judicial decisions declaring the practice illegal.

358.    Upon information and belief, Defendants have ceased, or slowed the illegal practice at various times, only to resume unlawful and discriminatory stops when official scrutiny has subsided.  Accordingly, an injunction is necessary and appropriate.

359.    The named Plaintiffs and other members of the Injunctive

360.    Class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from continuing the NYPD Highway Patrol's policy, practice, and/or custom of unconstitutional stops, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

361.    As a direct and proximate result of the acts and omissions of the Defendants, the named Plaintiffs, and the members of the classes they seek to represent, have been deprived of their rights to be free from unlawful search and seizure.

362.    As a direct and proximate result of the acts and omissions of the Defendants, the named Plaintiffs, and the members of the Damages Class they seek to represent, have suffered injuries and damages as described above.

## SECOND CAUSE OF ACTION

### (Named Plaintiffs' Claims Pursuant to 42 U.S.C. § 1983
### Against Officers Penney, Konkowski, Bistany, and Luti)

363.    Plaintiffs repeat and reiterate the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

364.    The conduct of Defendants Penney, Konkowski, Bistany, and Luti in stopping and searching Plaintiffs, were performed under color of law and without any legitimate constitutionally permissible grounds.

365.    As a direct and proximate result of such acts, Defendants Penney, Konkowski, Bistany, and Luti deprived Plaintiffs of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

366.    Plaintiff McLennon was subjected to an unlawful stop, search, detainment, false arrest, false imprisonment and malicious prosecution.

367.    Plaintiffs Perez and Price were subjected to unlawful stops, searches of their person and vehicle, detainment, false arrest, and false imprisonment.

368.    Plaintiff Augustine was subjected to an unlawful stop, search, and detainment of his person and vehicle.

369.    As a direct and proximate result of those constitutional abuses, Plaintiffs have suffered, and will continue to suffer, physical, mental and emotional pain and suffering, mental, anguish, embarrassment and humiliation.

370.    As a direct and proximate result of those constitutional abuses, Plaintiffs have suffered lost wages.

371.    The acts of Defendants were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiffs to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Claims of Named Plaintiffs and Class Members Against Defendants for Violations of Their Equal Protection Rights Under Article 1, § 11 of the New York State Constitution and under the Fourteenth Amendment and 42 U.S.C. § 1981 Pursuant to 42 U.S.C. § 1983)

372.    Plaintiffs repeat and reiterate the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

373.    Defendants have implemented and enforced a policy, practice, and/or custom of subjecting Plaintiffs and class members to unconstitutional and unlawful checkpoints based on race and/or national origin.

374.    Defendants' policy, practice, and/or custom of targeting neighborhoods of color for such traffic enforcement constitutes racial and ethnic profiling.

375.    The City's constitutional abuses and violations were and are directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendants City, Commissioner O'Neill, Former Commissioner Bratton, Chief Chan, Former Chief Tuller, Commander Ciorra, Inspector Ge, Captain Morgan, Captain Sanford, Lieutenant Lipke, Lieutenant Levine, and Sergeant Santiago, including: (1) the sanctioning and encouragement of, and failure to rectify, the Highway Patrol Unit's targeting of neighborhoods of color for unconstitutional checkpoints; and (2) the failure to train, supervise, monitor, and discipline Highway Patrol Unit officers engaged in such illegal and discriminatory traffic enforcement.

376.    Each Defendant has acted with deliberate indifference to the equal protection rights of Named Plaintiffs and class members.

377.    Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' equal protection rights

378.     By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

379.     Defendants continue to target neighborhoods of color through the use of unconstitutional traffic checkpoints.

380.     Because Plaintiffs and class members continue to drive in these neighborhoods, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights.

381.     As a direct and proximate cause of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights that entitle them to declaratory relief, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees.

### FOURTH CAUSE OF ACTION
### (Claims of Plaintiffs and Class of Violation of Title VI of the Civil Rights Act of 1964)

382.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.* prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities.

383.     Title VI prohibits intentional discrimination on the basis of race or ethnicity by prohibiting law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity, in a manner that has a discriminatory effect on a racial or ethnic group, or in a manner that is motivated by a discriminatory purpose.

384.     Defendants receive federal financial assistance, including financial assistance for law enforcement activities.

385.    Defendants devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of NYPD Highway Patrol Officers conducting unlawful and unconstitutional checkpoints in a manner that is motivated by race and ethnicity, resulting in a significant disparate impact on neighborhoods of color.

386.    Defendants' policy, practice, and custom of targeting neighborhoods with unlawful and unconstitutional checkpoints amounts to racial profiling.

387.    As a direct and proximate cause of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court will:

a)    Enter an order certifying this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b)    Enter a class-wide judgment declaring that the City and the NYPD Highway Patrol's policy, practice, and/or custom of maintaining unlawful *de facto* checkpoints resulting in the arbitrary and discretionary stops challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following practices and or customs of the City:

     i.    encouraging, sanctioning, and failing to rectify the NYPD Highway Patrol's unconstitutional checkpoint stops;

     ii.    failing to adequately train and supervise NYPD Highway Patrol officers;

     iii.    failing to adequately monitor the NYPD Highway Patrol Officers, and discipline Highway Patrol officers who violate constitutional rights.

c)    Issue an order for the following injunctive relief:

     i.    enjoining the NYPD Highway Patrol from continuing its policy, practice, and/or custom of unlawful and discriminatory checkpoint stops; and

     ii.    requiring the City and the Supervisory Officers to institute and implement improved policies and programs with respect to training, supervision, and discipline designed to eliminate the NYPD Highway Patrol's policy, practice, and/or custom of unlawful and discriminatory checkpoint stops.

d)    Award the named Plaintiff and members of the Damages class compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

e)    Award the named Plaintiff and members of the Damages class punitive damages against the individual Defendants in an amount to be determined at trial;

f)    Award the named Plaintiff and members of the plaintiff class reasonable attorneys' fees and costs; and

g)    Grant such other and further relief as this Court shall find as appropriate and just.

DATED:   New York, New York
     July 26, 2018

**Fisher & Byrialsen PLLC**


By: s/ _____
  Kaitlin F. Nares Esq. (KN2953)
  Jane H. Fisher-Byrialsen Esq.
  291 Broadway Suite 709
  New York, New York 10007
  (212) 962-0848


**Beldock Levine & Hoffman LLP**


By: s/ _____
  Karen Dippold, Esq.
  Luna Droubi, Esq.
  99 Park Avenue, PH/26th Floor
  New York, New York 10016
  (212) 490-0400


**The Legal Aid Society**


By: s/ _____
  Seymour James
  *Attorney-in-Chief*
  William D. Gibney, Esq.
  Steven Wasserman, Esq.
  199 Water Street
  New York, NY 10038
  (212) 577-3300


ATTORNEYS FOR PLAINTIFFS